**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **NOVARTIS PHARMACEUTICALS CORPORATION,** | **CIVIL ACTION** |
| Appellee, | |
| *v.* | **No. 21-3402-KSM** |
| **ADENEKAN OLAOLUWA ADESANYA,** et al., | |
| Appellants. | |

<u>**MEMORANDUM**</u>

**MARSTON, J.**                                **November 2, 2022**

*Pro Se* Appellants Adenekan OlaOluwa Adesanya and Afoluso Aderonke Adesanya appeal multiple orders entered by the bankruptcy court.  The Adesanyas primarily argue that the bankruptcy court erred by holding that the majority of their debt to Appellee Novartis Pharmaceuticals Corporation is nondischargeable.  They also take issue with multiple orders the bankruptcy court entered before reaching that decision, and the court's post-trial order denying the Adesanyas' motion to stay and continue proceedings in bankruptcy.  Last, the Adesanyas ask us to overturn a final judgment entered against them and in favor of Novartis in the United States District Court for the District of New Jersey (the "New Jersey Action").  For the reasons discussed below, the Court affirms the orders of the bankruptcy court in their entirety and declines to overturn the New Jersey judgment.

**I.    BACKGROUND**

The Adesanyas' debt to Novartis arises out of a judgment entered against them in the New Jersey Action, so the Court will discuss the facts underlying that Action before addressing the orders challenged on appeal.

**A.    The New Jersey Action**

      **1.    Afoluso's Employment at Novartis (Feb. 2010 to Sept. 2013)**

Afoluso was the Brand Safety Leader for Novartis's Oncology Business Unit between March 2010 and September 2013. *Adesanya v. Novartis Pharm. Corp.*, Case No. 2:13-cv-05564(SDW)(SCM), 2016 WL 4401522, at *1–2 (D.N.J. Aug. 15, 2016).[1]

In March 2010, when Novartis offered Afoluso the position, it did not know that she had lied on her job application and resume. *Id.* at *1. Among other things, Afoluso's application inflated her prior salaries, listed fake supervisors, and concealed a previous termination. *Id.*

When Afoluso accepted Novartis's offer, she signed multiple documents, including an offer letter, a Relocation Agreement, and an Employee Agreement. *Id.* at *2. (*See also* Doc. No. 21 at 547–48 (Afoluso's signed offer letter).) In those documents, she: (1) acknowledged that she had read and understood Novartis's Code of Conduct, (2) agreed to "devote [her] best efforts and full business loyalty to [her] employment with Novartis," (3) confirmed that she would "hold no other employment or engage in any other business which may adversely affect [her] ability to perform [her] job responsibilities at Novartis," and (4) accepted that her employment at Novartis was predicated on her relocating from Pennsylvania to New Jersey within 12 months of her hire

---

[1] The bankruptcy court granted preclusive effect to many of background facts found by the New Jersey District Court. *See In re Adesanya*, 613 B.R. 808, 826 (Bankr. E.D. Pa. 2020) ("In the context of dischargeability proceedings, collateral estoppel permits the court to accept facts established by previous judgment as evidence of nondischargeability."). The Court finds no error in this conclusion and, when appropriate, does the same. *See In re Docteroff*, 133 F.3d 210, 215 (3d Cir. 1997) ("Of course, dischargeability was not at issue in the previous lawsuit. That is not controlling, however, because the plaintiffs only seek to estop Docteroff from asserting certain facts . . . . Collateral estoppel is applicable if the facts established by the previous judgment in the Washington court . . . meet the requirements of nondischargeability . . . ."); *In re Hendry*, 428 B.R. 68, 77 (Bankr. D. Del. 2010) ("It is clear, under *Docteroff* and *Grogan*, that collateral estoppel may apply here to bar re-litigation of *facts* or issues previously decided." (emphasis added)).

date.  *See Adesanya*, 2016 WL 4401522, at *2.  (*See also* Doc. No. 21 at 547–48; *id.* at 555 (Afoluso's signed acknowledgment of having received and read Novartis's Code of Conduct).)

Despite agreeing that she would not work for Novartis's competitors while employed with the company, Afoluso, unbeknownst to Novartis, owned and worked for competing pharmaceutical companies throughout her tenure.  *Adesanya*, 2016 WL 4401522, at *2.  In March 2010, when Afoluso joined Novartis, she and her husband jointly owned a specialty pharmaceutical company called Global Drug (later renamed LaRon Pharmaceutical, Inc.).  *Id.* Then, in August 2011, Afoluso accepted a safety consultant position with Biomedical Consulting International, Inc.  *Id.*  In that position, she provided drug safety services to Auxilium Pharmaceuticals, and through Auxilium, to direct competitors of Novartis.  *Id.*  Last, in January 2012, Afoluso, under the alias Ron Nuga, M.D., began providing drug safety services to Astellas Pharma Global Development, Inc.  *Id.*

While working with these other companies, Afoluso received training on Novartis's Code of Conduct in January 2012, June 2012, and June 2013.  (Doc. No. 21 at 557.)  The Code of Conduct in effect in January 2012, like the Employee Agreement, forbids employees from holding positions that amount to a conflict of interest, stating, "Personal interests must not influence our business judgment or decision making."  (Doc. No. 12-7 at 38.) It also required disclosure of "actual or potential conflicts of interest."  (*Id.*)  Any employee aware of a situation that violates the Code of Conduct was required to report the violation to Novartis.  (*Id.* at 41.) Last, the Code of Conduct stated that any breach of its terms "will not be tolerated and can lead to disciplinary action up to and including termination of employment." (*Id.*)

In addition to the provisions of the Code applicable to every Novartis employee, associates in the United States, like Afoluso, were also required to comply with the U.S.

Supplemental Requirements to the Novartis Code of Conduct (the "U.S. Supplement").  (*Id.* at 26.)  The U.S. Supplement reinforced Novartis's disclosure requirements, stating that all associates must "immediately report to the Company all complaints of misconduct, including all known and suspected violations of . . . Novartis' own policies and procedures."  (*Id.* at 30; *see also id.* at 31 (referencing scenario where an employee reports their own misconduct).)  The U.S. Supplement stated in no uncertain terms that "employment with the Company and the Company's payment of any incentive and/or bonus compensation," including bonuses offered under the company's Annual Incentive Program ("AIP"), was "conditioned on compliance with applicable laws and associated company policies."  (*Id.* at 33; *see also id.* ("Any associate found by the Company to be in violation of the law or any material provision of any Company Policy . . . will not earn or receive any incentive bonus compensation for any period in which such violations occurred or were discovered.").)  Indeed, the U.S. Supplement went so far as to warn associates that they "will be required to repay to the Company any . . . incentive or bonus compensation already paid during a period in which the associate violates . . . any material provision of any Company Policy . . . ."  (*Id.*)  And "if an associate fails to repay such incentive or bonus compensation already paid to him or her, the Company may institute a lawsuit to recover the amount of incentive or bonus compensation plus costs and fees incurred in pursuing the lawsuit."  (*Id.*)

During and after her training on the Code of Conduct, Afoluso continued to work her other pharmaceutical jobs and did not, at any point, tell Novartis that she had an ownership interest in Global Drug or that she was working for Biomedical, Auxilium, and Astellas. *Adesanya*, 2016 WL 4401522, at *2.

4

In addition to holding positions with competitors, Afoluso also failed to relocate to New Jersey in the three years that she worked for Novartis.  *Id.*  Indeed, she took no steps to relocate, despite accepting $26,000 in relocation funds from the company.  *Id.*; *see also In re Adesanya*, No. 19-00124-amc, Doc. No. 155 at 74:2–7, 75:22–79:23 (Bankr. E.D. Pa.).  In April 2012, Novartis's Human Resources Business Partner, Megan Burley, told Afoluso that she needed to come into the office more frequently because her absence was negatively affecting her team. *Adesanya*, 2016 WL 4401522, at *2.  Afoluso, however, ignored this instruction, along with a second warning in March 2013, and in September 2013, Novartis fired Afoluso for poor performance, "predominantly driven about [by] not coming into the office three days a week, which impacted her interactions and collaboration with her close functional team members."  *Id.*

While at Novartis, Afoluso earned more than $1.2 million in cash compensation, including $210,403 in annual bonus payments under the AIP.  *Id.*

## 2. The New Jersey Action (Sept. 2013–June 2017)

Not long after her termination, Afoluso filed suit[2] in the United States District Court for the District of New Jersey, bringing claims of discrimination and retaliation under state and federal discrimination laws.  *Id.* at *3.  With its Answer, Novartis filed eight counterclaims against Afoluso, four of which are relevant here:  (1) fraud on Afoluso's employment application and resume, (2) breach of the Relocation Agreement, (3) breach of the duty of loyalty and Novartis's Conflicts Policy, and (4) breach of Novartis's AIP.  *Id.*

After a "contentious" discovery period that was "marked by delay," *id.*, Novartis filed an omnibus motion for summary judgment and sanctions, seeking judgment in its favor on the

---

[2] Although she was initially represented by counsel, counsel ultimately withdrew before trial, citing "ethical concerns."  *Id.*

counterclaims, dismissal of Afoluso's discrimination claims as a sanction for discovery misconduct, and sanctions against Adenekan for his discovery misconduct,[3] *see id.* at *1. The Adesanyas opposed Novartis's motions, and Afoluso filed her own motion for summary judgment on Novartis's counterclaims. *Id.* On August 15, 2016, the New Jersey District Court granted judgment in Novartis's favor on the four counterclaims referenced above, sanctioned Afoluso by dismissing her discrimination claims, and issued a monetary sanction against Adenekan. *Id.*

Around 10 months later, on June 5, 2017, the district court granted Novartis's application for an award of damages on the counterclaims as well as an award of reasonable attorneys' fees and costs incurred in connection with Afoluso's claims and Adenekan's misconduct. *Adesanya v. Novartis Pharm. Corp.*, Case No. 2:13-cv-05564 (SDW) (SCM), 2017 WL 2443060 (D.N.J. June 5, 2017). The court awarded damages on the counterclaims totaling $1,393,918.23, and attorney's fees and costs totaling $480,754.22 (collectively, the "Judgment"). *Id.* at *13. The court found fee shifting appropriate because "when a party has acted in bad faith, vexatiously, wantonly or for oppressive reasons," or when the court finds "that fraud has been practiced upon it, or that the very temple of justice has been defiled, it may assess attorney's fees against the responsible party." *Id.* at *4. The court then allocated $457,040.22 of the fee award against Afoluso for her "dogged pursuit of baseless claims and fraud," which "led to the dismissal of the

---

[3] Adenekan was not a party to the New Jersey Action, but he was the subject of a third-party subpoena for documents. *See Adesanya*, 2016 WL 4401522, at *3. When he refused to provide the documents demanded by the subpoena, Novartis moved to compel their production, and the Court twice ordered Adenekan to comply. *Id.* As of the date of the New Jersey District Court's opinion, Adenekan still had not complied with Novartis's document demands, and the court found that he had given false testimony during his deposition. *Id.* at *3–4; *see also Adesanya v. Novartis Pharm. Corp.*, 755 F. App'x 154, 157 (3d Cir. 2018) (explaining on appeal that "Adenekan[ ] failed to provide documents requested by subpoena, refused court orders to do so, and gave false testimony"). Thus, it found sanctions appropriate as against him as well. *Id.* On appeal, the Third Circuit affirmed the sanctions award against Adenekan. *Adesanya*, 755 F. App'x at 159.

Complaint," and allocated $23,714.00 of the fee award against Adenekan for his false testimony and his failure to comply with Novartis's document demands. *Id.* at *1, *9.

### 3.   The Adesanyas' Appeal (June 2017–Apr. 2019)

The Adesanyas appealed, and on October 11, 2018, the Third Circuit affirmed the district court's summary judgment opinion and sanctions awards in an unpublished opinion. *See generally Adesanya*, 755 F. App'x 154. The Adesanyas sought a writ of certiorari from the United States Supreme Court, but the Court denied their request on April 15, 2019. *See generally Adesanya v. Novartis Pharm. Corp.*, 139 S. Ct. 1567 (2019).

### 4.   Movement of the Judgment

After the Third Circuit affirmed the Judgment, Novartis successfully moved it from the New Jersey District Court to the Court of Common Pleas of Montgomery County, Pennsylvania. The Adesanyas filed a petition to strike the Judgment, which was denied. *See Adesanya v. Novartis Pharm. Corp.*, No. 830 EDA 2018, 2018 WL 4443082, at *2 (Pa. Super. Ct. Sept. 18, 2018) (attaching copy of opinion from Court of Common Pleas). They appealed the denial to the Pennsylvania Superior Court, which affirmed the lower court's decision. *See id.* at *1–2. The Adesanyas then filed a petition for allowance of appeal with the Pennsylvania Supreme Court, which was denied. *See Adesanya v. Novartis Pharm. Corp.*, 205 A.3d 1235, 1236 (Pa. 2019).

### B.   *The Bankruptcy Actions*

### 1.   The Bankruptcy Proceeding (No. 18-17260)

On November 2, 2018, after the Pennsylvania Superior Court affirmed the Court of Common Pleas decision, the Adesanyas filed a joint chapter 13 bankruptcy petition in the United States Bankruptcy Court for the Eastern District of Pennsylvania. *See In re Adesanya*, No. 18-17260-amc, Doc. No. 1 (Bankr. E.D. Pa.). The matter was assigned to the Honorable Ashley M. Chan, who scheduled the meeting of creditors required by 11 U.S.C. § 341(a) for January 23,

2019, with the deadline to object to the dischargeability of debts set for March 24, 2019. *In re Adesanya*, No. 18-17260-amc, Doc. No. 21. On February 26, 2019, the case was converted to a chapter 7 bankruptcy. *Id.*; *see also In re Adesanya*, No. 18-17260-amc, Doc. No. 73 (ordering that the case be converted from a chapter 13 to a chapter 7 *nunc pro tunc*, as of February 26, 2019).) And on March 14, 2019, the court appointed a new trustee, rescheduled the meeting of creditors, and set the new deadline to object to dischargeability as June 8, 2019. *In re Adesanya*, No. 18-17260-amc, Doc. Nos. 36, 37.

### 2. The Adversarial Proceeding (No. 19-124)

#### a. The Pleadings

On June 7, 2019, Novartis filed a Complaint to Determine Non-Dischargeability. *See generally In re Adesanya*, No. 19-00124-amc, Doc. No. 1. Novartis claimed that the Judgment was nondischargeable under 11 U.S.C. § 523(a) because it represented a debt for money obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's . . . financial condition." *See id.* at 8.

On July 8, 2019, the Adesanyas, proceeding *pro se*, submitted their Answer with affirmative defenses and counterclaims to Novartis's Complaint, bringing counterclaims for bad faith, defamation, civil conspiracy, reckless violations of automatic stay, and tortious interference. *In re Adesanya*, No. 19-00124-amc, Doc. No. 6. On Novartis's motion, the bankruptcy court dismissed the Adesanyas's counterclaims with prejudice. *In re Adesanya*, No. 19-00124-amc, Doc. No. 11.

#### b. Motions for Summary Judgment

On December 12, 2019, Novartis moved for summary judgment on its Complaint. *Id.* at 17. The Adesanyas opposed Novartis's motion and submitted their own motion for summary judgment. *Id.* at 18.

The bankruptcy court set a hearing on the summary judgment motions for March 16, 2020, but before that hearing occurred, the Adesanyas requested leave to "assert counterclaims against Plaintiff Novartis and counsel of bankruptcy fraud, fraudulent claims, concealment, and conspiracy." *See In re Adesanya*, No. 19-00124-amc, Doc. No. 47 at 8. Among other things, the Adesanyas asserted that Novartis and its counsel submitted "false claims" during the chapter 13 proceeding because Novartis requested interest on the Judgment beginning June 1, 2017 instead of June 21, 2017. *Id.* at 9–10 (referring to the request as "definitely a willfully misleading declaration" and a "false misleading claim"). In addition, for reasons that are far from clear, the Adesanyas alleged that Novartis's counsel was performing "pro bono services" and surmised that the only reason counsel would represent Novartis without collecting fees is because Novartis sold counsel the right to collect on the Judgment. *Id.* at 11–12. Following this ill-founded line of suppositions to their illogical conclusion, the Adesanyas argued that counsel was a "debt collector" subject to § 1692e of the Fair Debt Collection Practices Act ("FDCPA") and that counsel had failed to submit the declaration required of debt collectors under that provision. *Id.* at 10, 12. With their request to file counterclaims, the Adesanyas also sought discovery from Novartis and its counsel about their relationship. *See In re Adesanya*, No. 19-00124-amc, Doc. No. 48 at 3.

On March 10, having received neither a ruling from the bankruptcy court nor a response to their discovery requests from Novartis, the Adesanyas filed another letter with the court, this time asking the court to prioritize their request to file counterclaims "as agenda items" for the summary judgment hearing. *Id.*

The hearing went forward on March 16, and a few days later, the bankruptcy court issued an opinion and order granting in part and denying in part the parties' motions for summary

judgment.  *See generally In re Adesanya*, No. 19-00124-amc, Doc. Nos. 54, 55.  The court explained that it would not address the Adesanyas' miscellaneous "request for leave to file proposed counterclaims" or their "request for leave to take additional discovery related to the proposed counterclaims" until those requests were "properly noticed and/or filed in the proper case."  *In re Adesanya*, No. 19-00124-amc, Doc. No. 55 at 4 n.5.

　　　As for the substantive issues, the court considered the dischargeability of each portion of the Judgment under § 523(a)(2)(A) and found the New Jersey District Court's findings controlling as to many of the parties' factual disputes.  *Id.* at 2–3.  However, fact issues remained and thus, summary judgment was inappropriate on those portions of the Judgment that arose out of Afoluso's breach of the Relocation Agreement, breach of the duty of loyalty and the conflicts of interest policy, and breach of the AIP.  *Id.*

　　　The court granted summary judgment in Afoluso's favor to the extent Novartis claimed the portion of the Judgment attributable to Afoluso's fraud on her application and resume was nondischargeable under § 523(a)(2)(A).  *Id.* at 3; *see also In re Adesanya*, No. 19-00124-amc, Doc. No. 54 at 19 (finding that the false statements in her application related to her financial condition and thus, § 523(a)(2)(A) did not apply).  Likewise, the court granted summary judgment in Adenekan's favor to the extent Novartis claimed the portion of the Judgment attributable to sanctions against Adenekan was nondischargeable under § 523(a)(2)(A).  *In re Adesanya*, No. 19-00124-amc, Doc. No. 55 at 3; *see also In re Adesanya*, No. 19-00124-amc, Doc. No. 54 at 20 (finding § 523(a)(2)(A) inapplicable because "there is no evidence reflecting that [Adenekan] obtained any money, property, or services as a result of his false testimony and discovery misconduct in the District Court").  With respect to both issues, however, the court explained that Novartis "retains the ability to attempt to amend the Adversary Complaint in

accordance with Fed. R. Civ. P. 15(a)(2)." *In re Adesanya*, No. 19-00124-amc, Doc. No. 55 at 3 nn. 2–4.  The court noted that Novartis could likely seek nondischargeability under other provisions of § 523(a).  *In re Adesanya*, No. 19-00124-amc, Doc. No. 54 at 3 ("The Court's conclusion does not impact Novartis's ability to attempt to amend its complaint pursuant to Fed. R. Civ. P. 15 . . . to include any other counts that it may consider applicable, such as § 523(a)(2)(B) in connection with the portion of the Judgment attributable to fraud on Afoluso's job application, and § 523(a)(6) in connection with the portion of the Judgment attributable to sanctions awarded against Adenekan.").

Last, the bankruptcy court denied summary judgment as to all parties to the extent Novartis claimed the portion of the Judgment attributable to sanctions against Afoluso was dischargeable, finding that any ruling was dependent on "a determination of the dischargeability of all portions of the judgment attributable to the counterclaims." *In re Adesanya*, No. 19-00124-amc, Doc. No. 55 at 3.

### c.    **Amended Pleadings**

On April 23, 2020, Novartis moved for leave to file an amended complaint to add claims under § 523(a)(2)(B) and § 523(a)(6).  *In re Adesanya*, No. 19-00124-amc, Doc. No. 62.  The proposed Amended Complaint analyzed the dischargeability of the Judgment as six separate counts:

- Count I:  Related to fraud in Afoluso's Employment Application and resume, brought pursuant to § 523(a)(2)(B)

- Count II:  Related to breach of the Relocation Agreement, brought pursuant to § 523(a)(2)(A) or (B)

- Count III:  Related to breach of the AIP, brought pursuant to § 523(a)(2)(A) or (B)

- Count IV:  Related to breach of the duty of loyalty, brought pursuant to § 523(a)(2)(A) or (B)

- Count V:  Related to the sanctions award against Afoluso, brought pursuant to § 523(a)(6)

- Count VI:  Related to the sanctions award against Adenekan, brought pursuant to § 523(a)(6)

*See In re Adesanya*, No. 19-00124-amc, Doc. No. 62-3.

On May 5, the Adesanyas filed an opposition brief, along with a "follow up to previously submitted leave of court to file counterclaims of fraud, concealment, conspiracy to abuse of process against Novartis Pharmaceuticals Corporation and counsel of record (Mr. Stephen Hladik)." *In re Adesanya*, No. 19-00124-amc, Doc. No. 65 at 1; *see also In re Adesanya*, No. 19-00124-amc, Doc. Nos. 66, 67.  On May 13, 2020, the court granted Novartis's motion for leave to amend, but did not address the Adesanyas' request regarding filing counterclaims.  *In re Adesanya*, No. 19-00124-amc, Doc. No. 70.

Two days after that ruling, the Adesanyas again requested leave to file their counterclaims.  *See In re Adesanya*, No. 19-00124-amc, Doc. Nos. 73–75.  They also filed an Answer to Novartis's Amended Complaint that asserted eight affirmative defenses, the last of which was essentially a restatement of the proposed counterclaims.  *See In re Adesanya*, No. 19-00124-amc, Doc. No. 80.  Novartis opposed the motion to bring counterclaims and moved to strike the affirmative defenses listed in the Answer.  *In re Adesanya*, No. 19-00124-amc, Doc. Nos. 79, 86.  During a hearing on June 17, 2020, the court denied the motion to add counterclaims as moot.[4]  *In re Adesanya*, No. 19-00124-amc, Doc. No. 85.  And after a hearing on July 29, the bankruptcy court granted the motion to strike and ordered the Adesanyas' affirmative defenses stricken with prejudice.  *In re Adesanya*, No. 19-00124-amc, Doc. No. 101.

---

[4] It is unclear from the record before us why the motion was considered moot.

>           **d.      Trial**

The court held a virtual evidentiary hearing and bench trial on January 14, 2021.  *In re Adesanya*, No. 19-00124-amc, Doc. Nos. 127, 155.  Judge Chan began the trial by reminding everyone that "given [her] summary judgment opinion earlier this year, there are just a few narrow issues that [the parties] need to address today."  *In re Adesanya*, No. 19-00124-amc, Doc. No. 155 at 3:22–23.  She then outlined the unresolved issues for each count in the Amended Complaint, emphasizing that she had "previously ruled that collateral estoppel is going to bind this Court to accept the findings that were made in the District Court case."  *Id.* at 4:15–8:22 (explaining count by count which issues were undecided and which were governed by estoppel).  For the most part, the only remaining issues went to Afoluso's knowledge, purpose, and intent when she misrepresented her intention to move to New Jersey and when she failed to tell Novartis about her employment with Novartis's competitors.

At trial, the parties called two witnesses, Megan Burley and Afoluso.

>           *i.       Megan Burley's Testimony*

Trial began with Novartis calling Megan Burley, the human resources business partner for Afoluso's department at Novartis.[5]  *Id.* at 15:24, 19:4–9.  During her direct examination, Novartis used an exhibit labeled "Exhibit 83," which Burley identified as the 2010 Code of Conduct.[6]  *Id.* at 23:13–24:21.  Burley testified that Novartis's Code of Conduct is "seen not only when people join, but every year.  It is provided to each associate to be able to review,

---

[5] Burley joined Novartis in May 2011, and she supervised Afoluso until Afoluso was let go in September 2013.

[6] The Court has reviewed Exhibit 83, and it actually appears to be three separate documents.  The first 19 pages are an undated Code of Conduct; the next 8 pages are the U.S. Supplement dated 2011; and the final 7 pages are the Code of Conduct effective January 1, 2012 (the "2012 Code of Conduct").  (*See* Doc. No. 12-7 at 4–41.)  As we explain below, the failure to accurately describe the documents that make up Exhibit 83 caused confusion during Burley's direct and cross examinations.

acknowledge and be trained by." *Id.* at 25:3–7; *see also id.* at 25:11–17 (testifying that employees receive a copy of the Code of Conduct when they are hired, again during their first onboarding, and after that, during trainings).

Burley also testified that Afoluso completed annual training on the Code of Conduct in January 2012, June 2012, and June 2013. *Id.* at 33:16–24; *see also id.* at 33:25–34:2 (confirming that this training was in addition to the training Afoluso received when she was hired by the company). And although Burley was not working for Novartis when Afoluso was hired, she testified that all employees sign a form during onboarding to acknowledge that they have received the Code of Conduct, read it, understood it, and will comply with it. *Id.* at 31:3–18. Afoluso's acknowledgment was admitted into evidence as Exhibit 82. *Id.*

At the close of Burley's direct examination, the Adesanyas were given the opportunity to cross examine her. *Id.* at 46:8–12. During that cross examination, Adenekan focused on Exhibits 82 and 83, emphasizing that Exhibit 82—Afoluso's acknowledgment in March 2010 of having understood Novartis's Code of Conduct—could not have been made in connection with Exhibit 83—the alleged 2010 version of the Code of Conduct—because Exhibit 83 was not ratified by Novartis's Board of Directors until July 1, 2011.[7] *Id.* at 47:11–53:15. Instead, Afoluso's acknowledgment would have referred to the prior version of the Code of Conduct, which was ratified on August 26, 1999. *Id.* After pursuing this line of questioning, the Adesanyas moved to strike Exhibit 83 in its entirety because "it does not represent the version of the Code of Conducts [sic] that [Afoluso] would have signed." *Id.* at 52:2–11; *see also id.* at 190:8–191:20, 205:22–207:2. The court refused to exclude the document, finding that Afoluso

---

[7] As previously explained, *see supra* n.6, a review of Exhibit 83 shows that the final 7 pages are the 2012 Code of Conduct, the last page of which includes the ratification date. This final page was *not* part of the undated Code of Conduct, which made up *only* the first 19 pages of Exhibit 83.

"was trained on this Code of Conduct yearly from 2011 onward, at the very least, so that's coming in." *Id.* at 206:25–207:2.  Judge Chan also reiterated that the Code provided relevant background information and "the heart of this trial is really going to be the debtor/wife's testimony." *Id.* at 52:25–53:11; *see also id.* at 200:25–201:2 (Afoluso confirming that she received a copy of the Code of Conduct).  The court did, however, direct Novartis's counsel to file an affidavit after the trial that addressed the confusion surrounding which version of the Code of Conduct was in effect when Afoluso was at Novartis.  (*Id.* at 191:15–17.)

Adenekan then asked Burley about Afoluso's training history, and Novartis objected on relevance grounds. *Id.* at 53:22–54:17.  Adenekan argued that the testimony was relevant because it "has to do with what Afoluso knew, when she knew, and you know, if she deceived Novartis." *Id.* at 54:18–55:3.  In response, the court suggested that Adenekan save those issues for his wife's testimony:

> THE COURT:   Okay.  Well, may I make a suggestion?  To the extent that your wife disagrees with any of the testimony that was just given [by Burley], I think that the best way to go about doing it is to save these questions for your wife, and then I can make a credibility determination, right?
>
> You may present testimony from your wife that is inconsistent with their witness, right?  And what I will do at the end of the day is I'll assess credibility, right, based upon how they testify, and how they've answered these questions.  I can make that independent determination about whether, you know, your position is, in fact, correct.   Whether there is these inconsistencies, or whether or not — you know, and whether your wife was more credible or less.
>
> So I think at this point, to the extent that you disagree with their positions, I think we should save it for your wife's testimony, and make sure that either you ask her specific questions that contradict what this witness is saying, or she makes a statement that addresses that, okay?
>
> MR. ADESANYA:  Sure.

15

*Id.* at 55:4–56:3.

Adenekan then asked Burley about Afoluso's job application, and Novartis's counsel again objected. *Id.* at 56:5–20. Adenekan responded, "I just want to—it's just a couple of questions that we just wanted to ask. If you prefer that we wait until when Afoluso speaks, that's fine." *Id.* at 57:8–14. The court reiterated yet again that "the most relevant testimony is going to be [given by] your wife," and that the court's "preference is for you to limit your questions to your wife." *Id.* at 57:15–18. After confirming that he would be allowed to ask his wife about these issues, Adenekan ended his cross: "Well, with that, I think we'll wait till when, I mean, she speaks, and we'll be able to rebut Ms. Burley's testimony and, you know, she'll be able to speak for herself, and I'll ask a few questions, and then we'll turn it over to plaintiff's counsel." *Id.* at 58:3–7.

### ii. *Afoluso's Testimony*

Next, Novartis called Afoluso as a hostile witness. The transcript shows that she was combative and evasive throughout Novartis's examination, stating that she could not recollect whether she looked at schools in New Jersey, where she considered moving in New Jersey, or whether she entered into a contract with a realtor to buy a home in New Jersey. *Id.* at 74:2–78:7. And before long, the court was forced to interrupt her testimony to warn her that Adenekan could not coach her answers. *Id.* at 74:22–75:17.

Novartis's counsel then completed his questioning, which focused largely on the veracity of Afoluso's employment application and her understanding of the Code of Conduct. *See id.* at 101:16–104:5 (questions about Afoluso's interrogatory responses during the New Jersey Action), 167:10–180:19 (questions about the amount Afoluso listed as her "current" salary for Global Drug Safety on her job application to Novartis), 181:13–186:1 (questions about whether Afoluso

truthfully listed Sam Olla as her supervisor for Global Drug Safety on her job application), 189:23–193:25 (questions about the Code of Conduct and whether Afoluso understood that she was required to comply with the company's policies to be eligible for the AIP).  The Adesanyas objected to each line of questioning as barred by the doctrine of collateral estoppel because the issues were litigated during the New Jersey Action.  *See, e.g.*, *id.* at 102:18–104:4, 172:13–17.  The court overruled those objections, each time explaining that Novartis was not attempting to relitigate the New Jersey District Court's findings, but to address Afoluso's credibility as a witness.  *See, e.g.*, *id.* at 103:8–14, 172:18–20, 182:10–15, 193:8–18.

After Novartis finished questioning Afoluso, Adenekan was allowed to ask his wife questions, including questions about her employment application, the training that she received on the Code of Conduct, and her intent to move to New Jersey.  *Id.* at 131:17–133:9, 135:25–140:4, 141:17–156:18.  He also asked her about Novartis's conflicts of interest policy and the AIP bonus structure.  *Id.* at 158:14–162:18.

The trial ended after Afoluso's testimony.

### e.    Supplemental Filings

After the trial ended, Novartis filed supplemental trial exhibits, which counsel labeled: (1) the 2010 Code of Conduct, (2) the 2011 Novartis Supplement to the Code of Conduct, (3) the 2012 Code of Conduct, and (4) the U.S. Supplement to the 2012 Code of Conduct.[8]  *In re Adesanya*, No. 19-00124-amc, Doc. No. 153.  With the exhibits, Novartis's counsel submitted a declaration attesting to the truth of each exhibit.  *Id.*

The parties also submitted post-trial briefing.  *In re Adesanya*, No. 19-00124-amc, Doc. Nos. 157, 158, 160.  In their post-trial brief, the Adesanyas argued that the court should not

---

[8] Documents (1), (3), and (4) were collectively admitted as Exhibit 83.

consider Novartis's supplemental exhibits because they were improperly authenticated by

Novartis's attorney instead of a company representative with personal knowledge.  *In re*

*Adesanya*, No. 19-00124-amc, Doc. No. 160 at 2–8, 11–12.  They also argued that Exhibit 83

was improperly admitted into evidence during trial because it is a "false made up document,

intentionally duplicitous, prejudicial to defendants, confusing and misleading."  *Id.* at 10.

### f.    The Court's Trial Opinion and Order

On July 14, 2021, the bankruptcy court issued its opinion and order holding that the

majority of the Judgment was nondischargeable under §§ 523(a)(2)(A), 523(a)(2)(B), 523(a)(6).

*In re Adesanya*, No. 19-00124-amc, Doc. Nos. 161, 162.  Specifically, the court found that "the

Judgment previously entered against the Debtors in the [New Jersey] Action is held to be

nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A), 523(a)(2)(B), 523(a)(6), except for

$57,605 portion of the judgment attributable to defendant Afoluso Adesanya's 2011 breaches of

the AIP, which is held to be dischargeable."  *In re Adesanya*, No. 19-00124-amc, Doc. No. 162.

Accordingly, the court ruled in Novartis's favor on Counts I, II, IV, V, and VI of the Amended

Complaint, and it ruled in Novartis's favor in part on Count III and in the Adesanyas' favor in

part on Count III.

In reaching its conclusions, the bankruptcy court made four evidentiary rulings that are of

particular importance to this appeal.  First, Judge Chan heavily relied on the facts established in

the New Jersey Action:

> As discussed in this Court's opinion granting in part and denying in
> part Novartis's and the Debtors' motions for summary judgment in
> this adversary proceeding, the historical facts established in the
> District Court Action which Novartis already proved and which
> were essential to the District Court's decision cannot be relitigated.
> Such findings of fact in the prior proceeding may in the aggregate
> establish any or all of the elements of a section 523(a) claim as a
> matter of law.

*In re Adesanya*, 630 B.R. at 442 n.2.; *see also id.* at 453 (collateral estoppel as to Count I), 456–

57 (collateral estoppel as to Count II), 459 (collateral estoppel as to Count III), 461–62

(collateral estoppel as to Count IV), 464 & n.25 (collateral estoppel as to Count V), 465–66

(collateral estoppel as to Count VI).

Second, the court found much of Afoluso's testimony "incredibly confusing and

completely lacking in credibility."  *Id.* at 25 n.12; *see also, e.g.*, *id.* at 28 n.16 ("The Court does

not credit Afoluso's testimony that she always intended to relocate within twelve months of

starting her job at Novartis but became too busy at work.").

Third, the Court denied the Adesanyas' objections to Exhibit 83:

> In post-trial briefing submitted by the Debtors, they seek to have
> exhibit 83 stricken from the record.  They objected to this document
> at trial, and the Court determined that the document was relevant as
> one of the Codes of Conduct setting forth the Conflicts Policy and
> prohibition on certain external employment which Afoluso received
> training on during her time at Novartis while she was working
> external consulting positions.   Trial Tr. 205:22–207:3.   The
> document was authenticated by Novartis's human resources
> business partner, Megan Burley, based on her personal knowledge.
> *Id.* at 23:17–25:17.  Accordingly, the Court sees no basis for striking
> this document from the record.  Truthfully, the Debtors' post-trial
> brief is so confusing and rambling as to be virtually
> incomprehensible, and the Court genuinely does not understand on
> what other basis besides those expressed at trial the Debtors seek to
> have this document stricken.  Finding no basis, the Court denies the
> request.

*Id.* at p. 31 n.20.

Fourth, although the court admitted Exhibit 83, it agreed with the Adesanyas that it could

*not* consider Novartis's supplemental exhibits:

> When the Court invited Novartis to submit the version of the Code
> of Conduct in effect at the time Afoluso commenced her
> employment, the Court envisioned that Novartis would authenticate
> the document with the affidavit of someone from Novartis with
> personal knowledge of that version of the Code of Conduct rather

> than an affidavit of counsel for Novartis. Without proper
> authentication, the Court cannot consider the supplemental
> submission of the Code of Conduct purportedly in effect at the time
> Afoluso commenced her employment with Novartis.

*Id.* at 35 n.23. In effect, the court was only excluding one of the four supplemental documents—

the document labeled, "the 2011 Novartis Supplement to the Code of Conduct"—because the

other three documents were admitted at trial as Exhibit 83.

### g.      Post-Trial Motions

On July 29, 2021, the Adesanyas appealed the bankruptcy court's July 14, 2021 opinion

and order to this Court (*see* Doc. No. 1), citing multiple errors in the court's pretrial proceedings

as well as its July 14 Opinion, *see In re Adesanya*, No. 19-00124-amc, Doc. No. 173 (the

Adesanyas' Statement of Issues on Appeal).

A few days later, the Adesanyas filed a "Motion to Stay Order of July 14, 2021 and to

Continue Adversary Case 19-124 and Bankruptcy Case 18-17260" with the bankruptcy court. *In*

*re Adesanya*, No. 19-00124-amc, Doc. No. 175. Although the motion is difficult to follow, the

Adesanyas list the relief sought as "entry of an order that the pending legal proceedings in the

bankruptcy court be continued pending the outcome of the appeal." *Id.* at 2. In support of their

motion, they cited Federal Rule of Bankruptcy Procedure 8007(a)(1)–(2), which governs the stay

of a specific order or judgment pending appeal, along with Rule 8007(e), which governs the stay

or continuation of an entire case pending appeal. Fed. R. Bankr. P. 8007(a)(1)–(2), (e).

The bankruptcy court held a hearing on the motion on September 15, 2021 and issued an

order denying the motion the same day. *See In re Adesanya*, No. 19-00124-amc, Doc. No. 187.

In light of the Third Circuit's four-factor test for determining the appropriateness of a stay under

Rule 8007, the bankruptcy court found that the Adesanyas failed to show a stay was warranted in

this case. *Id.* at 5. In particular, the Adesanyas failed to show that they were likely to succeed on

the merits of this appeal or that while the appeal was pending, they would suffer irreparable harm incapable of being fully rectified by a successful appeal. *Id.* at 4–5.

## II.    STANDARD OF REVIEW

The Court considers a bankruptcy court's determinations under the same standards of review that would apply to the Third Circuit. *In re Mauz*, 672 F. App'x 176, 177 (3d Cir. 2017); *see also Villas at Bailey Springs Homeowners Ass'n, Inc. v. LaRicci*, Civil Action No. 1:10-CV-1952, 2011 WL 4591962, at *2 (M.D. Pa. Sept. 30, 2011) ("An appeal from a bankruptcy court's order places the District Court in the posture of an appellate tribunal, requiring it to accord the appropriate level of deference to the decision of the bankruptcy judge.").  Accordingly, we "review a bankruptcy court's legal determinations *de novo* and its factual findings for clear error." *In re Mauz*, 672 F. App'x at 177; *see also In re Morrissey*, 717 F.2d 100, 104 (3d Cir. 1983) ("[T]he standard of review of facts required by the bankruptcy rules is the familiar clearly erroneous test . . . ."); *In re Oakley*, 530 B.R. 251, 261 (E.D. Pa. 2015) ("The reviewing court—be it a district court or a court of appeals—reviews the bankruptcy court's legal determinations de novo, its factual findings for clear error, and its exercise of discretion for abuse thereof." (quotation marks omitted)).  A bankruptcy court's exercise of discretion, including evidentiary rulings, is reviewed for abuse thereof. *In re Sia*, Civil Action No. 15-1366, 2015 WL 9462089, at *4 (D.N.J. Dec. 28, 2015); *see also In re McCabe*, 588 B.R. 428, 435 (E.D. Pa. 2018) ("This Court must review a bankruptcy court's determination concerning the admissibility of evidence for abuse of discretion.").

The clear error standard means that a finding of fact "may only be overturned" if it is "completely devoid of credible evidentiary basis or bear[s] no rational relationship to the supporting data." *In re Mauz*, 672 F. App'x at 177 (quotation marks omitted); *see also In re Oakley*, 530 B.R. at 261 ("A factual finding is clearly erroneous when the reviewing court on the

entire evidence is left with the definite and firm conviction that a mistake has been committed." (quotation marks omitted)).  And a bankruptcy court abuses its discretion only "when its ruling is founded on an error of law or a misapplication of law to facts."  *In re Response U.S.A., Inc.*, 288 B.R. 88, 92 (D.N.J. 2003).

## III.   DISCUSSION

The Adesanyas raise 16 issues on appeal.  The first four deal with the bankruptcy court's pretrial rulings, and the Adesanyas argue that the bankruptcy court erred:  (1) In the underlying Bankruptcy Proceeding (No. 18-17260), when it rescheduled the deadline to file objections to dischargeability from March 24, 2019 to June 8, 2019 (*see* Doc. No. 12 at 10); (2) In the Adversarial Proceeding (No. 19-124), when it failed to dismiss Novartis's Complaint as time barred under Federal Rule of Bankruptcy Procedure 4007(c) (*see id.* at 11); (3) When it struck the Adesanyas' affirmative defenses and denied the Adesanyas' requests for leave to assert counterclaims (*see id.* at 12–13); and (4) At summary judgment, when it invited Novartis to amend its complaint, even though Novartis did not request leave to amend (*see id.* at 11–12).

Next, the Adesanyas argue that the court's evidentiary rulings at trial were made in error. In particular, they argue that the court erred when it:  (1) found Burley's testimony credible (*see id.* at 13), (2) denied the Adesanyas "the benefit of full cross examination" of Burley (*see id.* at 13), (3) admitted Exhibit 83, despite it being "a sham document" that was "deceitfully produced" (*see id.* at 14), and (4) rejected Novartis's supplemental exhibits without applying "the rigorous standards" raised by the Adesanyas in their post-trial brief (*see id.* at 14–15).

Third, the Adesanyas take issue with the court's July 14, 2021 opinion and order, arguing that the bankruptcy court erred when it found the majority of the Judgment nondischargeable. (*See id.* at 15–16).  They take issue with the court's ruling on each of the six counts asserted by Novartis in the Adversarial Proceeding.  (*Id.*)

Fourth, the Adesanyas argue that the bankruptcy court's September 15, 2021 order was entered in error because the court denied the motion to stay even though Novartis failed to file an opposition brief.  (*See id.* at 16–17.)  The Adesanyas also argue that the court erred because it "did not address the second relief, which was, to continue the case."  (*See id.* at 17.)

Last, the Adesanyas ask this Court to overturn the Judgment in the New Jersey Action because Novartis's attorney committed "brazen acts of fraud and fabrication of evidence on both the New Jersey court and the Bankruptcy court," such that the Judgment should be vacated and set aside under Federal Rule of Civil Procedure 60(d)(3).  (*Id.* at 48–50.)

The Court addresses these issues in turn below.

### A.  *Pretrial Rulings*

### 1.  Dischargeability Deadline

First, the Adesanyas contend that the bankruptcy court erred when, in the underlying Bankruptcy Proceeding (No. 18-17260), it rescheduled the deadline to file objections to dischargeability from March 24, 2019 to June 8, 2019.  (*See id.* at 10.)  They argue that because Novartis never moved for an extension of the deadline under Federal Rule of Bankruptcy Procedure 4007(c), the court abused its discretion when it reset the deadline *sua sponte*.  (*Id.* at 26–28.)  The Adesanyas did not object to or otherwise contest the new deadline before the bankruptcy court, and therefore, have waived this argument.[9]  *See In re Kaiser Grp. Int'l Inc.*, 399 F.3d 558, 565 (3d Cir. 2005) (confirming the "general rule that when a party fails to raise an issue in the bankruptcy court, the issue is waived and may not be considered by the district court on appeal").

---

[9] The Adesanyas claim they raised this argument below when they referenced the statute of limitations as an affirmative defense in response to Novartis's adversarial complaint.  (Doc. No. 12 at 27–28.)  The Court disagrees.  Raising a generic statute of limitations defense is a far cry from arguing that the court erred when it reset the deadline for objections to dischargeability.

In the alternative, even if we were to consider the Adesanyas' arguments, we find the bankruptcy court correctly set a new deadline for disputing dischargeability because the Adesanyas' chapter 13 proceeding had been converted to a chapter 7 proceeding.  *See* Fed. R. Bankr. P. 1019(2)(A) ("When a chapter . . . 13 case has been converted or reconverted to a chapter 7 case . . . [a] *new time period* for filing . . . a complaint objecting to discharge, or a complaint to obtain a determination of dischargeability of any debt shall commence under Rule[ ] 4007" unless the chapter 13 case is being reconverted to a chapter 7 case and the deadline for filing the complaint expired in the original chapter 7 case. (emphasis added)).  Once the Adesanyas' case was converted to a chapter 7 proceeding, the first meeting of creditors was scheduled for April 9, 2019.  The bankruptcy court correctly set the deadline for filing dischargeability complaints as 60 days after that deadline, June 8, 2019.  Fed. R. Bankr. P. 4007(c) ("[A] complaint to determine the dischargeability of a debt under § 523(c) shall be filed no later than 60 days after the first date set for the meeting of creditors . . . .").

### 2.     Timeliness of Dischargeability Complaint

Turning to the Adversarial Proceeding (No. 19-124), which is the focus of this appeal, the Adesanyas argue that the bankruptcy court erred when it failed to dismiss Novartis's Complaint as time barred under Federal Rule of Bankruptcy Procedure 4007(c).  (*See* Doc. No. 12 at 11.)  This is essentially a restatement of their first argument and denied for the same reasons.  Novartis timely filed its Complaint on June 7, 2019—one day before the June 8 deadline.  *See In re Adesanya*, No. 19-00124-amc, Doc. No. 1.

### 3.     Dismissal of Affirmative Defenses and Counterclaims

Next, the Adesanyas argue that the bankruptcy court erred when it denied the Adesanyas' request to assert counterclaims and struck their eighth affirmative defense.  (*See* Doc. No. 12 at 12–13.)  The Adesanyas argue that "[d]espite the serious nature of the legal issues raised, the

[b]ankruptcy court, without allowing for discovery to determine whether Appellee filed false

claims, or [whether] Appellee Attorney [was] a debt collector, or [whether] Appellee attorney as

a debt collector was a part owner of the debt, struck Appellants['] [a]ffirmative defenses and

went against set legal precedents."[10]  (*Id.* at 31.)  Novartis responds that the bankruptcy court

correctly denied the Adesanyas leave to file counterclaims and struck their eighth affirmative

defense.  (Doc. No. 13 at 38.)

We agree with Novartis.  The Adesanyas' proposed counterclaims alleged that:

(1) Novartis and its counsel violated 18 U.S.C. § 152(4) in the underlying Bankruptcy

Proceeding when they "entered false claims" that requested interest on the Judgment from June

*1*, 2017, instead of June *21*, 2017; and (2) Novartis's counsel "operates as a collection agency"

for the Judgment and was therefore, required under 15 U.S.C. § 1692e to "declare rates, fees, and

all compensation terms including assignment of debt as contingency fee."  *In re Adesanya*, No.

19-00124-amc, Doc. No. 47 at 10–14.

Although it is not clear from the record why the bankruptcy court denied the Adesanyas'

motion to amend the answer to add these claims, their denial was nonetheless appropriate

because amendment would have been futile.[11]  *See* Fed. R. Civ. P. 15(a)(2) ("[A] party may

amend its pleading only with the opposing party's written consent or the court's leave.  The court

---

[10] Although the Adesanyas state the bankruptcy court erred by striking all of their affirmative
defenses, their arguments relate only to the eighth affirmative defense.  The Adesanyas have not argued
that the bankruptcy court erred in dismissing the Adesanyas' seven other affirmative defenses, so the
Court does not address those here.  *See Jones v. Hashagen*, 512 F. App'x 179, 182 (3d Cir. 2013) ("An
appellant's failure to raise an issue on appeal generally constitutes waiver of that issue.").

[11] The Court is not concerned with the lack of any written justification for the bankruptcy court's
ruling, because on appeal, a reviewing court may affirm a lower court's decision on alternative grounds.
*See Fellheimer, Eichen & Braverman, P.C. v. Charter Tech., Inc.*, 57 F.3d 1215, 1224 (3d Cir. 1995)
(recognizing "the Supreme Court's long-standing holding that 'in the review of judicial proceedings the
rule is settled that if the decision below is correct, it must be affirmed, although the lower court relied
upon a wrong ground or gave a wrong reason'" (quoting *Brown v. Allen*, 344 U.S. 443, 459 (1953))).

should freely give leave when justice so requires."); *Heyl & Patterson Int'l, Inc. v. F. D. Rich Hous. of the V.I., Inc.*, 663 F.2d 419, 425 (3d Cir. 1981) ("In the absence of substantial or undue prejudice, denial [of a motion to amend] must be grounded in bad faith or dilatory motives, truly undue or unexplained delay, repeated failure to cure deficiency by amendments previously allowed or futility of amendment.").

Beginning with the allegedly "false claim" that Novartis and its counsel filed in the chapter 13 action, the counterclaim is futile on its face because the Adesanyas bring the claim under 18 U.S.C. § 152(4)—a *criminal* statute that cannot provide grounds for a claim in bankruptcy. *See Garcia v. Bucks Cnty. Justice Ctr.*, Civil Action No. 17-3381, 2017 WL 4126349, at *4 (E.D. Pa. Sept. 18, 2017) ("[I]f plaintiff is raising claims under criminal statutes, those claims are dismissed with prejudice as legally baseless; amendment of those claims would be futile.").

The Adesanyas' FDCPA claim is likewise futile.  Even if the bankruptcy court had credited the seemingly baseless allegation that Novartis's counsel was an undisclosed creditor, the Judgment is not a "debt" governed by the FDCPA.  The FDCPA governs "debts" involved in consumer transactions, meaning "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes."  15 U.S.C. § 1692a(5).  Because the Judgment is unrelated to a "consumer transaction" and the amount owed was not incurred for "personal, family or household use," the FDCPA could not give rise to a cause of action in this, or any other, case.  *See Dixon v. Golden-Masano-Bradley, Law Firm*, 228 F. App'x 142, 144 (3d Cir. 2007) ("As noted by the District Court, the promissory note specifically stated that the proceeds of the note 'WILL NOT be used for

personal, family or household purposes.'  Therefore, because Dixon agreed to the purpose of the

promissory note (or at least agreed to what the purpose of the promissory note would not be),

Dixon cannot convert the amount owed on the promissory note to fall within the meaning of

'debt' simply because he chose not to comply with the agreed upon terms. Thus, the District

Court properly dismissed Dixon's FDCPA, PFCEUA and PUTPCPL claims."); *Turner v. Cook*,

362 F.3d 1219, 1228 (9th Cir. 2004) ("Turner's underlying 'obligation' to pay Yeo and Martini

does not arise out of a consumer transaction, and hence is not a 'debt' within the meaning of the

FDCPA."); *cf. Albanese v. Portnoff Law Assocs., Ltd.*, 301 F. Supp. 2d 389, 396 (E.D. Pa. 2004)

("First, the delinquent trash fees constitute a debt under the FDCPA because the Plaintiff was

obligated to pay money as a result of a transaction whose subject was primarily for household

purposes.").

     For those reasons, the Court also finds the bankruptcy court correctly struck the

Adesanyas' eighth affirmative defense, which is essentially a restatement of both counterclaims.

"[A] court may strike from a pleading an insufficient defense or any redundant, immaterial,

impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  Although motions to strike are granted

sparingly, the court will strike allegations and claims that prejudice the opposing party and either

"bear[ ] no possible relation to the controversy" or "cannot succeed under any circumstances."

*In re Hutt*, Case No. 17-35499 (JNP), 2018 WL 3725747, at *2 (Bankr. D.N.J. Aug. 2, 2018).

Because the Adesanyas' eighth affirmative defense alleged Novartis and its counsel committed

fraud, they were prejudiced by the defense.  *See id.* at *3 ("As the disputed material contains

allegations of fraudulent or criminal activity, the Court finds it could prejudice the Plaintiff.").

And as discussed above, the Adesanyas' claims fail as a matter of law.  *See F.D.I.C. v. Modular

Homes, Inc.*, 859 F. Supp. 117, 120 (D.N.J. 1994) (explaining that motions to strike may be

"granted when a defense is legally insufficient under any set of facts which may be inferred from the allegations of the pleading"); *In re ASHINC Corp.*, Bank. No. 12–11564 (CSS) (Jointly Administered), 2017 WL 2774736, at *5 (D. Del. June 27, 2017) (finding the bankruptcy court had "discretion to dismiss an affirmative defense" that was based on "the same allegations underlying [the] dismissed cross-claims and counterclaim"); *Lawrence v. City of Bethlehem*, No. CIV. A. 97-CV-1824, 1998 WL 964214, at *4 (E.D. Pa. Nov. 2, 1998) ("An allegation is impertinent or immaterial" and should be struck "if it has no possible relationship to the controversy."); *ATX Telecomms. Servs. v. U.S. Wats*, Civ. A. No. 92-3328, 1993 WL 30076, at *4 (E.D. Pa. Feb. 5, 1993) (explaining that courts strike material from a pleading where it is "clear that the information could not have any bearing on the matter being litigated").

The bankruptcy court did not err when it denied the Adesanyas' motion to assert counterclaims and struck their eighth affirmative defense.

### 4.    <u>Novartis's Leave to Amend the Complaint</u>

Last, the Adesanyas argue that the bankruptcy court erred when it granted summary judgment in their favor but invited Novartis to file an amended complaint.  (*See* Doc. No. 12 at 11–12.)  After granting summary judgment in the Adesanyas' favor on the subject of Counts I and VI, the bankruptcy court noted that Novartis "retains the ability to attempt to amend the Adversary Complaint in accordance with Fed. R. Civ. P. 15(a)(2)."  *In re Adesanya*, No. 19-00124-amc, Doc. No. 55 at 3 nn.2–3.  The Adesanyas, referring to the court's statements as "unsolicited legal advice," argue that it was for Novartis, not the court, to broach the subject of amendment.

We disagree.  The bankruptcy court did not provide legal advice, but instead, explained why it was granting summary judgment in the Adesanyas' favor as to some of Novartis's causes of action and stated that Novartis would be given an opportunity to amend its complaint to raise

those claims under the appropriate statutory provisions.  Such statements are commonplace in federal court.  *See In re Bagel*, Bankr. No. 92–11440F. Adv. No. 92–0675F, 1992 WL 477052, at *11 (Bankr. E.D. Pa. Dec. 17, 1992) (denying the plaintiff's motion for summary judgment on count II of its nondischargeability complaint but stating that the court would "permit the plaintiff to amend its complaint"); *see also, e.g.*, *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002) ("[W]e suggest that district judges *expressly state*, where appropriate, that the plaintiff has leave to amend within a specified period of time . . . ." (emphasis added)); *Tani v. FPL/Next Era Energy (FPL Capital Grp., Inc.*), 811 F. Supp. 2d 1004, 1019 (D. Del. 2011) ("Plaintiff will be given leave to amend the Title VII and ADA claims to cure his pleading deficiencies.").

*      *      *

For these reasons, the Adesanyas have failed to show that the district court erred in its pretrial rulings.

### B.      Evidentiary Rulings

Next, the Court turns to the bankruptcy court's evidentiary rulings during and after trial.

### 1.      Credibility of Burley's Testimony

First, the Adesanyas argue that the bankruptcy court erred when it found Burley's testimony credible.  (*See* Doc. No. 12 at 13.)  Before addressing this argument, we emphasize the substantial deference that this Court *must* give the bankruptcy court's credibility determinations. *See Kool, Mann, Coffee & Co. v. Coffey*, 300 F.3d 340, 353 (3d Cir. 2002) ("[I]n reviewing the bankruptcy court's factual findings we are to give due regard to the opportunity of that court to judge first-hand the credibility of witnesses."); *Suarez v. Alonso*, No. 13–265(FLW)(DEA), 2013 WL 5288021, at *6 (D.N.J. Sept. 17, 2103) ("[A]s the above cited findings demonstrate, the Bankruptcy Court based its findings primarily on credibility determinations after receiving testimony from Debtor.  On appeal, this Court's review of such determinations is highly

circumscribed, 'a review of factual findings is limited to clear error . . . and I give deference to the trial court's determination of credibility.'" (quoting *In re Graves*, 33 F.3d 242, 251 (3d Cir. 1994))).

The Adesanyas argue that the bankruptcy court erred because it accepted Burley's testimony as true even though she "lied under oath" about Exhibit 83.  (*Id.* at 32.)  The Court referenced some of the confusion related to Exhibit 83 above, *see supra* nn.5–6, and discusses this exhibit in further detail below.  For now, the Court notes only that Burley testified that Exhibit 83 appeared to be the 2010 Code of Conduct used by Novartis and that every employee is given a copy of the Code when they begin working with the company.  *See In re Adesanya*, No. 19-00124-amc, Doc. No. 155 at 24:19–25:17.  However, Exhibit 83 actually consisted of three separate documents:  an undated Code of Conduct, the U.S. Supplement, and the 2012 Code of Conduct.  (*See* Doc. No. 12-7 at 4–41.)

Burley, believing Exhibit 83 was *one* document (the 2010 Code of Conduct), testified that although she "was not an employee in 2010," she believed Exhibit 83 "would have been provided to [Afoluso] in 2010 and, therefore, acknowledged" by Afoluso.  *In re Adesanya*, No. 19-00124-amc, Doc. No. 155 at 48:10–14 ("Q: And you testified that this was the same one she—Afoluso read and acknowledged in 2010.  A: Again, I would say I was not an employee in 2010.  What I testified was this would be the version that would have been provided to her in 2010 and, therefore, acknowledged."); *see also id.* at 48:17–21 ("Q: I'm just repeating what you said, that this would have been the version provided to her in 2010.  A: Again, I cannot say, as I was not an employee in 2010.  It's my understanding that it would have been; I was not an employee in 2010.").

The Adesanyas argue that Burley "lied" in this testimony because at the end of Exhibit 83—in the 2012 Code of Conduct—it says that the document was approved by the Novartis Board of Directors on July 1, 2011.  Believing that the entirety of Exhibit 83 was the 2010 Code of Conduct—and not realizing that it was actually three distinct documents—the Adesanyas reasoned that the 2010 Code of Conduct was not approved until July 1, 2011, and therefore, could not have been acknowledged by Afoluso in March 2010.  *Id.* at 49:13–50:10. Accordingly, the Adesanyas argue Burley's testimony to the contrary must be inaccurate.

But even if Exhibit 83 had contained only the document that was approved in July 2011, it would not have rendered Burley's testimony deceitful.  For one, Burley's testimony centered on Novartis's common practice of providing each employee with a copy of the applicable Code of Conduct when he or she joins the company.  *Id.* at 24:19–25:17.  This testimony is undisputed regardless of which version of the Code of Conduct Burley reviewed at trial.  Second, when Burley was presented with the July 2011 approval date, she acknowledged that Exhibit 83 appeared to have been approved after Afoluso's start date, confirmed that she "d[id]n't know if this was the document" that Afoluso acknowledged receiving in 2010, and reiterated that she "was not an employee when [Afoluso] started" and therefore, could "[ ]not attest to" whether Exhibit 83 was the document that Afoluso reviewed and signed in March 2010.  *Id.* at 49:13–50:10.

Given these clarifications, and viewing Burley's testimony as a whole, we cannot find that Burley "lied under oath," and we find no abuse of discretion in the bankruptcy court's determination that her testimony was credible.

### 2.   Burley's Cross Examination

The Adesanyas also argue that the bankruptcy court denied them "the benefit of full cross examination" of Burley.  (*See* Doc. No. 12 at 13.)  This is inaccurate.  The Adesanyas were able

to cross examine Burley.  Indeed, recognizing their *pro se* status, the court gave them leeway in their questioning, allowing Adenekan to question Burley on Afoluso's behalf about Exhibit 83 and overruling Novartis's procedural objections to form.  *See In re Adesanya*, No. 19-00124-amc, Doc. No. 155 at 50:25–51:3, 54:6–10.  When Adenekan's questions touched on other topics, however, including Novartis's training on company policies and Afoluso's job application, Novartis objected to the questions as irrelevant and inappropriate.  *Id.* at 54:17, 56:18–20.  Each time, the court tried to discover the purpose of the Adesanyas' questions.  *See id.* at 54:18–19 ("THE COURT:  Okay.  So what are you trying to get at here, sir?"); *id.* at 57:5–7 ("THE COURT:  But what is—so what are you trying to—repeat the question again, sir?  I just want to make sure I hear exactly what it is.").  And after each examination, the court reiterated that Afoluso's testimony was the testimony the court was most interested in hearing based on the issues remaining.  *Id.* at 54:14–55:21 ("THE COURT: . . .  So I think at this point, to the extent that you disagree with their position, I think we should save it for your wife's testimony, and make sure that either you ask her specific questions that contradict what this witness is saying, or she makes a statement that addresses that, okay."); *see also id.* at 57:15–18 ("THE COURT:  Well, I think that for me, the most relevant testimony is going to be for your wife.  So, you know, to the extent that—I mean I think my preference is for you to limit your questions to your wife.").[12]

      A trial court has substantial discretion to manage trial and the scope of cross examination, particularly when that examination touches on issues of only marginal relevance.  *See* Fed. R.

---

[12] Notably, most of the issues remaining for the bankruptcy court to decide related to Afoluso's knowledge and intent when she made misleading statements and omissions to Novartis.  Questions about the automation of Novartis's training programs and the financial nature of Afoluso's job application are of minimal, if any, relevance to those issues.

Evid. 611(a) ("The court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to:  (1) make those procedures effective for determining the truth; (2) avoid wasting time; and (3) protect witnesses from harassment or undue embarrassment.")[13]; *cf. Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) ("[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.").  The Court finds no abuse of that discretion here.

The Court also finds it telling that the trial court allowed the Adesanyas to continue with their questioning after each objection.  *See id.* at 55:25–56:2 ("MR. ADESANYA:  Thank you, Your Honor.  Are we still allowed to ask the witness questions?  THE COURT:  Yeah, go ahead.").  And it was *Adenekan* who ultimately chose to end the cross examination with the understanding that he could question his wife:

> MR ADESANYA:     I'll be allowed to ask my wife the questions then?
>
> THE COURT:          Yes.
>
> MR. ADESANYA:    Okay.  Well, with that, I think we'll wait till when, I mean, she speaks, and we'll be able to rebut Ms. Burley's testimony and, you know, she'll be able to speak for herself, and I'll ask a few questions, and then we'll turn it over to plaintiff's counsel.

*Id.* at 57:21–58:7; *see also id.* at 59:25–60:7 (the Judge dismissing Burley as a witness without any objection from the Adesanyas).  Finally, we note that Adenekan was allowed to question his

---

[13] The Federal Rules of Evidence apply to proceedings in bankruptcy.  Fed. R. Bankr. P. at 9017 ("The Federal Rules of Evidence and Rules 43, 44, and 44.1 F.R.Civ.P. apply in cases under the Code.").

wife about her training on Novartis's policies and her employment application.  *See id.* at 131:17–133:9, 135:25–140:4.

In sum, the Adesanyas were able to cross examine Burley; Adenekan, not the court, ended that cross examination; and the court acted within its discretion to advise the Adesanyas about the limited scope of the trial and about the testimony that would be most relevant to the issues remaining in the case.  The Court finds no abuse of discretion as to this issue.

### 3.   Exhibit 83

Next, the Adesanyas argue that the bankruptcy court erred when it admitted Exhibit 83 into evidence because Novartis was estopped from relying on that exhibit and because post-trial filings show the exhibit is a "sham document."  (Doc. No. 12 at 13–15.)  As a reminder, Burley testified at trial that Exhibit 83 was the 2010 Code of Conduct, but it actually consisted of three documents, including first, one undated version of the Code of Conduct, second, the U.S. Supplement, and last, the 2012 Code of Conduct (which was ratified by Novartis's Board of Directors on July 1, 2011).

#### i.      *Collateral Estoppel*

The Adesanyas argue that the bankruptcy court incorrectly applied the doctrine of collateral estoppel against them and not against Novartis when the court allowed Novartis to "re-introduce new evidence"—Exhibit 83—"in a matter fully adjudicated in the New Jersey District court action."  (*Id.* at 13–14.)  The Adesanyas believe that Novartis was "estopped from advancing this exhibit" because "it had a full chance and opportunity to litigate in the New Jersey action which resulted in the judgment award."  (*Id.* at 34–35.)  This argument misunderstands the nature of collateral estoppel, which bars parties from relitigating *issues*, not from introducing *exhibits*.  *See In re Himowitz*, 162 B.R. 109, 112 (Bankr. D.N.J. 1993) ("The

34

doctrine of issue preclusion or collateral estoppel can, however, be applied in proceedings under Code section 523(a) to prevent relitigation of issues which have previously been determined by a court of competent jurisdiction."); *see also Grogan v. Garner*, 498 U.S. 279, 283, 291 (1991) (holding that "the standard of proof for the dischargeability exceptions in 11 U.S.C. § 523(a) is the ordinary preponderance-of-the-evidence standard," and noting that because nondischargeability must be proved only by a preponderance of the evidence, "all creditors who have secured fraud judgments, the elements of which are the same as those of the fraud discharge exception, will be exempt from discharge under collateral estoppel principles").

In other words, Novartis was free to rely on Exhibit 83 to the extent it was relevant to an issue not previously decided in the New Jersey action.  That is the case here.  Novartis relied on Exhibit 83 to show:  (1) Afoluso knew that she would be denied participation in the AIP if she violated the Code of Conduct, *see In re Adesanya*, No. 19-00124-amc, Doc. No. 155 at 29:25–30:7, 189:23–190:5; and (2) Afoluso knew she was not allowed to have a second job or own or work for a competing company under the conflicts of interest rules contained in the Code of Conduct, *id.* at 27:4–15, 29:1–8.  Both issues remained after the bankruptcy court issued its summary judgment opinion finding collateral estoppel precluded litigation of some, *but not all*, of the elements of Novartis's § 523 claims.  *See id.* at 6:16–7:18 ("Count 3 is the breach of the annual incentive program. . . .  [C]ertain elements of the 523(a)(2)(A) claim based upon false pretenses have already been established on summary judgment by collateral estoppel. . . .  So at issue for trial on this count are:  Number one, whether she actually knew her failure to disclose her conflicts of interest created a misleading impression that she was eligible for the AIP when she was not . . . ."); *id.* at 7:19–8:9 ("Count 4 is the breach of duty of loyalty and conflicts policy. Certain elements of this claim, based upon false pretenses, have already been established at

summary judgment on collateral estoppel . . . .  So at trial, for the breach of duty and loyalty and conflicts policy, I'm only focused on this count for whether she actually knew she was creating a misleading impression by failing to disclose her external employment.").

As noted above, collateral estoppel is a limited doctrine that applies only to issues and only when:  (1) the issue sought to be precluded is the same as that involved in the prior action; (2) the issue was actually litigated; (3) the issue was determined by a valid and final judgment; and (4) that determination was essential to the prior judgment.  *Haize v. Hanover Ins. Co.*, 536 F.2d 576, 579 (3d Cir. 1976).  With this standard in mind, we find that the bankruptcy court did not err when it denied the Adesanyas' objection to Exhibit 83 on estoppel grounds.[14]

ii.        *Sham Document*

The Adesanyas also argue that Exhibit 83 was incorrectly admitted into evidence despite being "a sham document" that was "deceitfully produced."  (*See* Doc. No. 12 at 14.)  Their argument is difficult to follow, but they seem to suggest that Exhibit 83 must be a sham document because when it is compared to Novartis's post-trial supplemental exhibits, it is clear that Exhibit 83 is actually multiple independent documents and not the singular exhibit it proclaims to be:

> Exhibit 83 is a sham document, produced hastily towards trial. When the court invited Novartis to submit the Code of [C]onduct in effect at the time Afoluso [s]tarted work in Novartis, due to the objection of Appellants to Exhibit 83, it rejected the submission of Appellee Attorney for lack of proper authentication.  However, as Appellants pointed out in their post trial brief, Exhibit 83 and the Appellee Attorney declaration are essentially the same document.

---

[14] The Adesanyas also assert that Exhibit 83 "was not submitted in the Appellee summary judgment records in the New Jersey District Court Action."  (Doc. No. 12 at 14; *see also id.* at 35.)  We will not sift through the voluminous record to determine the truth of this assertion.  It is sufficient to find that even if Exhibit 83 was not introduced, the bankruptcy court was not limited to considering only those exhibits introduced in the New Jersey Action.

36

> In fact the Attorney submitted four separate documents which were condensed together as Exhibit 83.

(*Id.* at 35; *see also id.* ("This District court is hereby moved to examine this Trial Exhibit 83, against the [p]ost trial declaration of Appellee Attorney to determine the validity as admissible evidence.").)

As briefly discussed above, a review of Exhibit 83 shows that it is comprised of three separate documents:  (1) an undated Code of Conduct, (2) the U.S. Supplement, and (3) the 2012 Code of Conduct.  (*See* Doc. No. 12-7 at 5–41.)  For comparison, Novartis's post-trial supplemental filing,  includes four exhibits:  (1) the identical undated Code of Conduct, which comprised the first 19 pages of Exhibit 83, (2) a  document, *not* previously introduced during the trial, titled, "Code of Conduct Novartis Pharmaceuticals Corporation Supplemental Requirements" and dated December 10, 2011, (3) the identical 2012 Code of Conduct, which comprised the last 7 pages of Exhibit 83, and (4) the identical U.S. Supplement, which comprised the middle 8 pages of Exhibit 83.  (*See* Doc. No. 12-9 at 3–54.)  There is no doubt that because Exhibit 83 comprised three separate documents, there was tremendous confusion at trial, and the documents should have been introduced as three separate exhibits.  However, this failure on its own does not render Exhibit 83 a "sham," and the Adesanyas have not pointed to any evidence that suggests the three documents were manufactured by counsel.

Nevertheless, the Court agrees with the Adesanyas that part of Exhibit 83 was not properly authenticated, and therefore, should not have been considered by the bankruptcy court. Authentication of evidence is governed by Federal Rule of Evidence 901.  "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."  Fed. R. Evid. 901(a).  Testimony of a witness with knowledge is not the only method of authentication,

and a court may consider circumstantial evidence to find that "the material in question is indeed what [a party] claims." *See McQueeney v. Wilmington Trust Co.*, 779 F.2d 916, 928 (3d Cir. 1985) ("[W]e hold that circumstantial evidence may, in principle, suffice to authenticate a document."). "The burden of proof for authentication is slight," and all that "is required is a foundation from which the fact-finder could legitimately infer that the evidence is what the proponent claims it to be." *Id.* (quotation marks omitted).

The Court finds that slight burden was met with regard to the U.S. Supplement and the 2012 Code of Conduct. The documents are titled "Code of Conduct" and "Code of Conduct U.S. Supplemental Requirements," contain the "Novartis" logo, and refer to Novartis by name and address. *See* Fed. R. Evid. 901(b)(4) (stating that an item may be authenticated by its "appearance, contents, substance, internal patterns, or other distinctive characteristics . . . taken together with all the circumstances"); *see also McQueeney*, 779 F.2d at 929 ("The specificity, regularity, and official appearance of the documents increase the likelihood of their being authentic.").[15] In addition, although Burley could not authenticate the effective date of Exhibit 83, she did testify that it appeared to be a version of Novartis's Code of Conduct. And a review of the two documents clears up any confusion about their applicability, because both include dates that show they were in effect, at the latest, on January 1, 2012. The 2012 Code of Conduct states that it was approved in July 2011 and effective January 1, 2012. Likewise, the U.S. Supplement includes a copyright date of 2011 and clarifies that it is part of Novartis's Code of Conduct.

---

[15] During trial, the Adesanyas conceded that the bankruptcy court could rely on Exhibit 83 to show the relevant policies beginning in 2012. *See In re Adesanya*, No. 19-00124-amc, Doc. No. 155 at 190:25–191:2 ("Well, so, Your Honor, if [Novartis's counsel] wants to refer to this [Exhibit 83], then probably he should refer to it maybe from 2012 onward, not—not below that.").

The undated Code of Conduct, however, was not properly authenticated, and the bankruptcy court abused its discretion when it admitted that portion of Exhibit 83 into evidence. Although Burley initially testified that Exhibit 83 was "the Code of Conduct from 2010," during cross examination, she contradicted her earlier testimony, stating, "I don't know if this was the document" that Afoluso read and signed in March 2010. *See In re Adesanya*, No. 19-00124-amc, Doc. No. 155 at 49:19–50:10. And nothing on the face of the document tells the Court when this version of the Code was in force. Notably, the 2012 Code of Conduct sates that it is "replac[ing] the Novartis Code of Conduct of August 26, 1999." (Doc. No. 12-7 at 41.) But the undated Code of Conduct references the Sarbanes-Oxley Act of 2002, which means it could not have been the version of the Code approved in 1999. (*Id.* at 23.) Without further evidence of when this version of the Code was in place, the bankruptcy court erred when it admitted the first 19 pages of Exhibit 83 and relied on this undated Code of Conduct in reaching its conclusions.

We discuss the implications, if any, of this error below in our discussion of the bankruptcy court's conclusions as to each Count.

### 4.   Novartis's Supplemental Exhibits

Last, the Adesanyas argue that even though the bankruptcy court rejected Novartis's supplemental exhibits, the court failed to apply "the rigorous standards" raised by the Adesanyas in their post-trial brief. (*See* Doc. No. 12 at 14–15.) Because the Adesanyas succeeded on this issue before the bankruptcy court, the Court does not address it further. *See, e.g.*, *Balcom v. Lynn Ladder & Scaffolding Co.*, 806 F.2d 1127, 1127 (1st Cir. 1986) ("Appellant cannot appeal the district court's failure to set aside this finding for the basic reason that appellant did not lose the case below; it won. A party cannot appeal a judgment entered in its favor, because it lacks a 'personal stake in the appeal' sufficient to support appellate jurisdiction.").

### C.    July 14, 2021 Dischargeability Opinion and Order

Turning to the bankruptcy court's July 14, 2021 opinion, which serves as the basis for this appeal, the Adesanyas argue that the court erred when it found the majority of the Judgment nondischargeable.  (*See id.* at 15–16.)  We address the court's rulings as to each count in turn.

### 1.    <u>Count I:  Fraud on Afoluso's Application and Resume</u>

First, the Adesanyas contend that the court erred when it found nondischargeable the portion of the Judgment attributable to fraud on Afoluso's employment application and resume. They argue that the court applied the wrong legal standard and ignored a relevant case from the Fourth Circuit.

### a.    Reasonable Reliance

The Adesanyas argue that the court "veered away from examining the actions of [Novartis] itself under the rigorous standards of 523(a)(2)(B)" because it wrongly applied a justifiable reliance standard instead of the reasonable reliance standard required by § 523(a)(2)(B).[16]  (Doc. No. 12 at 15, 36.)

"The reasonableness of a creditor's reliance under § 523(a)(2)(B) is judged by an objective standard, i.e., that degree of care which would be exercised by a reasonably cautious person in the same business transaction under similar circumstances."  *In re Cohn*, 54 F.3d 1108, 1117 (3d Cir. 1995).  In determining reasonable reliance, courts consider three factors:

> (1) the creditor's standard practices in evaluating credit-worthiness (absent other factors, there is reasonable reliance where the creditor follows its normal business practices); (2) the standards or customs

---

[16] It is possible the Adesanyas were confused by the bankruptcy court's alternative finding that even if the false statements on Afoluso's application and resume did not relate to her financial condition—a requirement of a § 523(a)(2)(B) claim—the court would nonetheless find this portion of the Judgment nondischargeable under § 523(a)(2)(A).  *In re Adesanya*, 630 B.R. at 455 n.13. Section 523(a)(2)(A) claims require justifiable reliance, a less demanding standard than the reasonable reliance standard of § 523(a)(2)(B).  *See Field v. Mans*, 516 U.S. 59, 74 (1995) ("[W]e hold that § 523(a)(2)(A) requires justifiable, not reasonable, reliance.").

of the creditor's industry in evaluating credit-worthiness (what is considered a commercially reasonable investigation of the information supplied by debtor); and (3) the surrounding circumstances existing at the time of the debtor's application for credit (whether there existed a "red flag" that would have alerted an ordinarily prudent lender to the possibility that the information is inaccurate, whether there existed previous business dealings that gave rise to a relationship of trust, or whether even minimal investigation would have revealed the inaccuracy of the debtor's representations).

*Id.* The bankruptcy court applied that standard and analyzed those factors here. *In re Adesanya*, 630 B.R. at 454 n.11 (considering the three factors for reasonable reliance outlined in *In re Cohn* and concluding that "Novartis's reliance on Afoluso's representations in her employment application was reasonable and that it acted as a reasonable entity in its same situation would have").

Beginning with the first two factors, the Adesanyas argue that the bankruptcy court erred when it discredited the Adesanyas for their failure to submit expert testimony about the industry standard for background checks because it was enough to show that Novartis failed to contact Afoluso's prior employer, Global Drug, as required by "its own customary steps for background checks." (Doc. No. 12 at 38–39.)  This argument misunderstands the bankruptcy court's conclusions.

Under the first factor, the court found that Novartis "had a background check performed on Afoluso" in accordance with its standard practice, and that there was no evidence that Novartis's standard practice included contacting the applicant's current employer. *In re Adesanya*, 630 B.R. at 454 n.11.  This conclusion was based on the evidence produced at trial, and the Adesanyas have not cited any conflicting evidence in the record.  As for the second *Cohn* factor, the bankruptcy court noted that "neither party introduced expert testimony regarding industry practices in conducting background checks associated with hiring practices in the

pharmaceutical industry." *Id.* The court did not "discredit" the Adesanyas for failing to submit expert testimony, but merely noted that the second *Cohn* factor was neutral because neither party submitted evidence about industry practice.

The Adesanyas also argue that the court's conclusion as the third *Cohn* factor—that Novartis reasonably relied on Afoluso's statements on the job application and resume—was not supported by the evidence at trial because (1) the application contained "scribbles and inaccuracies" that Novartis chose to ignore, and (2) Novartis failed to contact Global Drug to confirm Afoluso's statements. (Doc. No. 12 at 38.) But the court considered Afoluso's handwritten inclusion of "Target 30%" on the employment application and found that "although it may have been odd, that single reference alone would not have alerted Novartis to the multiple misrepresentations throughout her application, including those about phony supervisors, any other salaries which may have been inflated, or the fact that Global Drug paid no salaries *at all* in *at least* 2009 and 2010, and had made almost no revenue for the entirety of its existence." *In re Adesanya*, 630 B.R. at 454 n.11.

As for Novartis's failure to call Global Drug to verify Afoluso's salary, the bankruptcy court found that such a call would have been pointless because in addition to owning the company, Afoluso and Adenekan were Global Drug's *only* employees. *Id.* Given this fact, along with the court's assessment of Afoluso as incredible, Adenekan's "obvious interest in his wife's employment and his own obstructive conduct in the District [C]ourt Action," the bankruptcy court inferred that even if Novartis had contacted Global Drug, the Adesanyas "would have verified her employment information falsely and not been forthcoming regarding the company's financial situation." *Id.* The Adesanyas argue that this inference was improper because "[i]t is an abuse of discretion to infer something not based on evidence." (Doc. 12 at

38.)  We find that the bankruptcy court acted well within its right as fact finder when it inferred—based on evidence of the Adesanyas' credibility, the financial incentive they had to lie, and Global Drug's nonexistent employee makeup—that the Adesanyas would have been untruthful even if Novartis had tried to verify Afoluso's employment history.  *See In re 15375 Mem. Corp. v. Bepco, L.P.*, 589 F.3d 605, 616 (3d Cir. 2009) (explaining that appellate review requires consideration of the bankruptcy court's "basic and *inferred* facts" under "clearly erroneous review" (emphasis added)); *see also Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) ("[J]uries are routinely instructed that the law makes no distinction between the weight or value to be given to either direct or circumstantial evidence."); EVIDENCE, *Black's Law Dictionary* (11th ed. 2019) (defining "circumstantial evidence" as "[e]vidence based on inference and not on personal knowledge or observation").

### b.    *In re Broyles*

The Adesanyas also argue that the bankruptcy court should have found the debt dischargeable because Afoluso provided a benefit to Novartis.  (Doc. No. 12 at 38.)  To support this argument, the Adesanyas rely on *In re Broyles*, 55 F.3d 980, 983–84 (4th Cir. 1995).  But *In re Broyles* did not hold that a debt is dischargeable under § 523(a)(2)(B) merely because the creditor received some benefit from its contract with the debtor.

A brief discussion of *In re Broyles* is helpful for understanding why this argument fails. In that case, the debtors were guarantors of two commercial loans that Citizens Bank of Maryland issued the debtors' corporations.  *Id.* at 981.  "Testimony before the bankruptcy court established that the two loans, in effect, restructured approximately $600,000 of preexisting debt and provided an additional $200,000 in new credit," and "[a]lthough prior loans from [the bank] had been unsecured, the new $500,000 term loan was secured" by construction equipment worth approximately $700,000.  *Id.*  The bank required a personal guarantee from the debtors, not a

personal financial statement, but the debtors submitted a signed financial statement anyway. *Id.*
at 981–82. That document misrepresented that the debtors personally owned real estate that was
actually owned by one of the corporations. A year later when the companies renewed the line of
credit, the bank requested an updated financial statement. *Id.* at 982. The debtors updated the
previous financial statement, but they failed to include $766,434 that they owed for stock they
had purchased a year earlier. *Id.*

The loans went into default, and the bank received a court judgment against the debtors.
*Id.* The debtors filed bankruptcy and the bank argued that the judgment was a nondischargeable
debt under § 523(a)(2)(B) because the debtors "induced the bank to rely on two of their personal
financial statements that were materially false." *Id.* The bankruptcy court disagreed, and after a
bench trial, it found that the bank had failed to show it reasonably relied on the personal financial
statements. *Id.* at 981, 983. In reaching this conclusion, the court considered several factors. *Id.*
at 983. First, the initial commitment letter from the bank to the debtors was conditioned on a
personal guarantee by the debtors and made no mention of a personal financial statement. *Id.*
Second, "even without the personal guarantee, the arrangement was beneficial" to the bank
because it replaced a non-term loan with a term loan and "supplanted an unsecured obligation
with one secured by nearly $700,000 of corporate collateral." *Id*. Thus, "the court concluded
that [the bank] had 'sufficient incentive to make these loans for business reasons only, without
relying upon the net worth of the guarantors.'" *Id.* Third, the bankruptcy court relied on an
internal memorandum for the bank, which "indicated that the rationale for approving the loan
was a 'long term deposit and loan relationship' and 'earnings performance'"—not the debtors'
personal financial status. *Id.* Last, the court considered the specific misrepresentations on the
financial sheets and found that the bank had actually questioned whether the debtors owned the

real estate referenced in the first financial statement. *Id.* at 984. Considering the record as a whole, the district court (and ultimately the Fourth Circuit), found the "bankruptcy court was not clearly erroneous in concluding that Citizens did not rely on misrepresentations" made by the debtors. *Id.* at 984–85.

As this summary shows, the fact that a creditor gains some benefit from a transaction does not render a debt dischargeable. Instead, the creditor's potential benefit from the transaction is one factor that a court may consider in determining whether the creditor actually relied on a false financial statement. Here, although Afoluso's employment provided some benefit to Novartis, there is no evidence that Novartis would have hired her—and paid her the salary that it paid her—regardless of the false information that she included on her employment application. To the contrary, the evidence shows that Novartis reasonably relied on exactly that information when it chose to extend an offer to Afoluso.

The Court finds no error in the bankruptcy court's conclusions as to Count I.

## 2.   Breach of the Relocation Agreement

Next, the Adesanyas argue that the bankruptcy court erred when it found nondischargeable the portion of the Judgment attributable to Afoluso's breach of the Relocation Agreement because the court "considered only [Afoluso's] state of mind when [the] [R]elocation [Agreement] was signed" and "did not consider [Novartis's] state of mind and what [Novartis] knew." (Doc. No. 12 at 15.)

The Court interprets the Adesanyas' argument as claiming that the bankruptcy court erred when it found Novartis justifiably relied on Afoluso's agreement to relocate to New Jersey. To succeed on its § 523(a)(2)(A) claim, Novartis had to prove by a preponderance of the evidence that: "(1) [Afoluso] made representations knowing they were false; (2) [Alfoluso] made the representations with the intent and purpose of deceiving the plaintiff; (3) [it] justifiably relied on

the debtor's false representations; and (4) [it] suffered a loss or damage as a proximate consequence of the representations having been made." *In re Adalian*, 474 B.R. 150, 160 (M.D. Pa. 2012). Contrary to the Adesanyas' arguments, the bankruptcy court did, in fact, consider Novartis's mindset and concluded that the company's "reliance on Afoluso's representation that she would relocate completely justifiable given that her employment was predicated on her relocating, an expectation clearly set forth even in her Offer Letter." *In re Adesanya*, 630 B.R. at 458.

The Adesanyas also argue that the bankruptcy court erred when it considered Novartis's knowledge at the time Afoluso signed the offer letter instead of considering Novartis's knowledge in the months that followed. But it does not matter when or how Novartis ultimately learned that Afoluso breached the agreement. The issue before the bankruptcy court was whether Novartis was justified, at the time it entered the Relocation Agreement and paid her $26,000, in relying on Afoluso's assurances that she would in fact relocate. We find no clear error in the bankruptcy court's findings in this regard.[17]

The Adesanyas also argue that the court erred "in the interpretation of Novartis Relocation Agreement and policy" because it was not for the court to interpret. (Doc. No. 12 at 40.) The Adesanyas do not disagree with the Court's interpretation of any specific provision, but instead, broadly suggest that the court was not qualified to interpret the Novartis Relocation

---

[17] The Adesanyas argue that the court failed to "review the [R]elocation [A]greement for [Novartis's] required actions" and instead, "placed the full burden on" Afoluso. (Doc. No. 12 at 38.) They assert that under the Relocation Agreement, Novartis was supposed to provide Afoluso with real estate referrals. (*Id.* at 39–40.) And they argue that Novartis's questions during trial about whether and when Afoluso looked for homes in New Jersey is "really about Novartis trying to hide its own responsibility," stating "Novartis . . . should be made to answer" questions such as, "Did Novartis perform its own responsibilities to provide Afoluso with the List of Agents?" (*Id.* at 40.) These questions are immaterial because the issue is not whether *Novartis* breached the Relocation Agreement, but instead, whether *Afoluso* breached the Relocation Agreement and *her* false representations in connection with that breach.

Agreement.  (*Id.*)  This is incorrect.  The Relocation Agreement is a contract.  Courts are frequently required to interpret contract provisions.  *See Glenpointe Assocs., III v. Regency Sav. Bank*, Civil Action No. 06–cv–1690 (DRD), 2006 WL 2786885, at *5 (D.N.J. Sept. 25, 2006) ("The interpretation of the terms of a contract are decided by the court as a matter of law unless the meaning is both unclear and dependent on conflicting testimony."); *see also A.D.L. v. Cinnaminson Twp. Bd. of Educ.*, 975 F. Supp. 2d 459, 464 (D.N.J. 2013) ("The court makes the determination whether a contractual term is clear or ambiguous." (quotation marks omitted)).

Last, the Adesanyas suggest the court erred when it found uncredible "Afoluso's testimony that she always intended to relocate within 12 months of starting her job at Novartis but became too busy at work."  (Doc. No. 12 at 40 (quoting *In re Adesanya*, 630 B.R. at 457 n.16).)  The Adesanyas incorrectly argue that Burley is the only witness who could have "directly countered or corroborated Afoluso's testimony."  (*Id.*)  According to the Adesanyas, because Burley was discharged before she could testify one way or the other, the court erred when it refused to credit Afoluso's testimony.  (*Id.*)  We disagree.  The bankruptcy court is tasked with making credibility decisions.  Here, it found Afoluso's testimony—that she intended to relocate—not credible because Afoluso testified that she took *no* steps to actually find a home in New Jersey.

Because the court's ruling is supported by the evidence presented at trial, the Court finds no error as to Count II.

### 3.     <u>Count III:  Breach of the Duty of Loyalty and Conflicts Policy</u>

Next, the Adesanyas argue that the bankruptcy court erred when it found nondichargeable the portion of the Judgment attributable to the Afoluso's breach of the duty of loyalty and Novartis's Conflicts Policy.  (*Id.* at 15–16.)  The bankruptcy court found that Afoluso knew she was creating a misleading impression when she failed to disclose her external employment to

Novartis because:  (1) Afoluso signed the Employee Agreement on March 3, 2010, which described the duty of loyalty and prohibited her from holding other employment that could negatively affect her job responsibilities, and (2) despite knowing it was not allowed under the Employee Agreement, Afoluso "still obtained and held external employment with other pharmaceutical companies throughout her tenure with Novartis, without informing Novartis, for whom she was supposed to be working full time." *In re Adesanya*, 630 B.R. at 459.

The Adesanyas pick this conclusion apart, arguing that it is riddled with "serious fact finding gaps." (Doc. No. 12 at 41.)  First, they argue that the court incorrectly found that Afoluso held external employment with other pharmaceutical companies throughout her tenure with Novartis.  We disagree.  The court based its finding on the New Jersey District Court's summary judgment opinion, which found Afoluso was a part-owner of Global Drug/La Ron when she joined Novartis in 2010 and that she later accepted at least two different pharmaceutical consulting jobs, one for Biomedical and Auxilium and one for Astellas.  Because these findings served as the basis for the New Jersey Court's summary judgment opinion, the bankruptcy court was collaterally estopped from reconsidering these facts.  *See Haize v. Hanover Ins. Co.*, 536 F.2d 576, 579 (3d Cir. 1976) (explaining that collateral estoppel bars relitigation of an issue that was:  (1) involved in a prior action, (2) actually litigated, and (3) determined by a valid and final judgment, which was (4) essential to the prior judgment).  Thus, the court did not err when it found Afoluso owned or worked for competing companies throughout her employment with Novartis.

Next, the Adesanyas argue that the court ignored Afoluso's training records, which showed she was not trained on the Code of Conduct until 2012, and therefore, the court incorrectly concluded that Afoluso was aware, throughout her tenure with Novartis, that holding

external employment amounted to a conflict of interest.  (Doc. No. 12 at 41–42.)  In its opinion, the court found that Afoluso "was aware from the very outset of her employment that she was prohibited from holding external employment."  *In re Adesanya*, 630 B.R. at 459.  This conclusion was supported by the evidence at trial, which showed Afoluso signed the Employee Agreement on March 3, 2010, agreeing that she would "devote her best efforts and full business loyalty to her employment with Novartis and that she would hold no other employment or engage in any other business which would adversely affect her ability to perform her job responsibilities."  *Id.*  Given this provision in the Employee Agreement, which Afoluso admits to signing in March 2010, the bankruptcy court's conclusion was not clearly erroneous.

Next, the Adesanyas argue that the court's findings on this count are erroneous because (1) "Afoluso's yearly employee performance evaluations never showed any concerns of adverse effect on Afoluso's work throughout her tenure with Novartis"; and (2) Afoluso was employed to work with Novartis on a full time basis, or 40 hours per week, and the "inquiry into full time work with Novartis and any adverse effects should be completely limited to the 40 hour week per contract."[18]  (Doc. No. 12 at 42.)  But neither issue has any bearing on the question before the bankruptcy court, i.e., whether Afoluso knew that she was creating a misleading impression

---

[18] The Adesanyas also argue that the court committed "prejudicial error" when it "based its conclusions on the perjurious Exhibit 83."  (Doc. No. 12 at 42.)  As discussed above, we agree with the Adesanyas that the bankruptcy court erred when it considered the undated Code of Conduct in Exhibit 83. However, that reliance was harmless as to Count III because the court's conclusion is substantially supported by other evidence that was properly authenticated and admitted, including the Employee Agreement, the 2012 Code of Conduct, and the U.S. Supplement.  *See In re Tonopah Solar Energy, LLC*, __ B.R. __, Case No. 20-11844 (KBO), 2022 WL 982558, at *17 (D. Del. Mar. 31, 2022) ("As to Appellants, the question for determining feasibility was 'whether sufficient funds are available or will be available to CMB and SolarReserve if it should prevail against the debtor in its Nevada State Court lawsuit.'  Because the answer to that question would be 'yes,' even if all of Mr. Pugh's testimony concerning Plant operations, the Repair Schedule, and PPA negotiations had been excluded, any error in admitting such testimony was harmless." (cleaned up)).  Those documents not only describe Novartis's conflicts of interest policy, but also state that all employees are *required* to disclose any violations of that policy or risk termination.

when she failed to disclose her external employment to Novartis.  Instead, both arguments seek
to relitigate whether Adesanya breached her duty of loyalty when she held positions with
competitors and whether that breach harmed Novartis.  The New Jersey Court granted summary
judgment in Novartis's favor on both issues:

> To bring a claim for breach of the duty of loyalty under New Jersey
> law, a party must show: 1) an employee-employer relationship;
> 2) breach of the duty of loyalty; and 3) harm.  An employee's duty
> of loyalty demands that he not act contrary to the employer's interest
> or compete with his or her employer.
>
> Here, there is no dispute that the Plaintiff and Defendant had an
> employee-employer relationship.  It is also unquestionable that
> Plaintiff violated both her common law duty of loyalty and her
> contractual obligations under Novartis's Conflicts Policy.  Both
> prohibit Plaintiff from acting in a manner contrary to Novartis's
> interest or competing with the company. . . .  By actively soliciting
> and accepting consulting positions with Novartis's competitors and
> subsequently billing hundreds of hours to them without disclosing
> or seeking approval for that outside work, Plaintiff impermissibly
> competed with her employer and divided the loyalty she owed
> Novartis.  It is also clear that Defendant was harmed.  Novartis paid
> Plaintiff for a full-time position, but Plaintiff siphoned off time she
> owed Novartis to other activities. As such Defendant lost the money
> it paid her for time she did not commit to the company.  This Court
> will grant Defendant's Motion for Summary Judgment and deny
> Plaintiff's Cross-Motion for Summary Judgment as to Count Eight
> of Defendant's Counterclaims.

*Adesanya*, 2016 WL 4401522, at *10 (quotation marks and citations omitted).  Because the New
Jersey Court found that Afoluso's secondary employment harmed Novartis, the bankruptcy court
correctly refused to reconsider that issue in this proceeding.

The Court finds no error in the bankruptcy court's ruling as to Count III.

### 4.   Count IV:  Breach of the AIP

Fourth, the Adesanyas argue that the bankruptcy court erred when it found
nondischargeable all but a small portion of the Judgment attributable to Afoluso's breach of the
AIP.  (Doc. No. 12 at 16.)  The Adesanyas argue that the court incorrectly relied on Exhibit 83 in

50

reaching its "contradictory" conclusion about when and how Afoluso learned about the conflicts of interest policy and the AIP.[19]  (*Id.* at 42–44.)  We agree that the Court incorrectly relied on the undated Code of Conduct to find that Afoluso knew, in January 2012, that her acceptance of any bonus payments was predicated on compliance with Novartis's policies, including the conflicts of interest policy.

Nevertheless, this reliance was harmless because, as discussed above, the 2012 Code of Conduct and the Code's U.S. Supplement *were* properly authenticated, and they warned employees that "employment with the Company and the Company's payment of any incentive and/or bonus compensation are conditioned on compliance with applicable laws and associated company policies."  (Doc. No. 12-7 at 33; *see also id.* ("Any associate found by the Company to be in violation of the law or any material provision of any Company Policy . . . will not earn or receive any incentive bonus compensation for any period in which such violations occurred or were discovered.").)  Because Afoluso was trained on these documents in January 2012, they support the bankruptcy court's conclusion that as of that date, Afoluso knew that she would be disqualified from bonuses if Novartis learned she was violating the conflicts of interest policy.

Accordingly, the court's reliance on the undated Code of Conduct was harmless.  *See* Fed. R. Civ. P. 61 ("Unless justice requires otherwise, no error in admitting or excluding evidence--or any other error by the court or a party--is ground for granting a new trial, for setting

---

[19] The Adesanyas argue that the court's conclusions are contradictory because it found that Afoluso knew about the conflicts policy when she signed the Employee Agreement in 2010, and also that that Afoluso only realized in January 2012, after her training on the 2011 Code of Conduct, that her external employment rendered her ineligible for the AIP.  These conclusions are not contradictory.  The evidence showed that Afoluso knew in March 2010—when she signed the Employee Agreement—that holding secondary employment would violate her duty of loyalty to the company and amount to a breach of the Employee Agreement.  The Agreement did not, however, discuss the AIP.  Instead, the court found that Afoluso learned, at the latest, in January 2012 that holding external employment could render her ineligible for incentive pay under the AIP because January 2012 is when Afoluso attended training on the Code of Conduct, which contained such a provision.

aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order.  At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights."); *Langbord v. U.S. Dep't of Treas.*, 832 F.3d 170, 196 (3d Cir. 2016) ("Our review of the entire record leads us to conclude that the Government was able to clearly and convincingly prove the elements of its case without reliance on the tainted evidence. Accordingly, for the reasons we shall explain, we conclude that the evidentiary errors were harmless."); *In re Tonopah Solar Energy, LLC*, 2022 WL 982558, at *17.

The court's ruling on Count IV is affirmed.

### 5.      Count V:  Sanctions Against Afoluso

Fifth, the Adesanyas argue that the bankruptcy court erred when it found nondischargeable the portion of the Judgment attributable to sanctions against Afoluso.  (Doc. No. 12 at 16.)  The Adesanyas argue that the bankruptcy court erred in finding this award nondischargeable because "this award, basically legal fees for its success in the New Jersey Action is not pro-rated by the Bankruptcy court" to account for the portion of the Judgment attributable to breach of the AIP that the court found dischargeable.  (*Id.*)

They misunderstand the basis for the New Jersey District Court's sanctions decision and the bankruptcy court's findings.  The New Jersey District Court sanctioned Afoluso after finding she committed fraud on the court and made "false misrepresentations . . . throughout discovery" in a "concerted effort to impede discovery."  *See In re Adesanya*, 630 B.R. at 463.  In other words, the New Jersey District Court's sanctions were not tied to the bankruptcy court's ruling on any given count at summary judgment, but instead, based on an overall "unconscionable scheme" that Afoluso enacted throughout the lawsuit.  *Id.* at 463–64.  The bankruptcy court, in turn, found that Afoluso was estopped from arguing that her conduct was not willful and malicious because the New Jersey District Court had found, among other things, that Afoluso

was "'entirely culpable' for her 'willful, determined effort . . . to deceive.'"  *Id.* at 464.  The bankruptcy court also found that the New Jersey District Court's rulings "demonstrate that Afoluso's fraudulent scheme to mislead and manipulate Novartis and the District Court was undertaken intentionally to injure Novartis in its ability to prosecute its Counterclaims and defend against Afoluso's claims in the District Court Action."  *Id.*

As this brief summary shows, the bankruptcy court did not err when it failed to pro-rate the portion of the Judgment attributable to the sanctions award against Afoluso.  That debt was not merely "legal fees for [Novartis's] success in the New Jersey Action," such that its nondischargeability is tied to the nondischargeability of each portion of the Judgment.  Instead, it was a debt incurred by Afoluso's willfully deceitful conduct throughout the New Jersey Action.

The Court finds no error in the bankruptcy court's rulings on this count.

### 6.    Count VI:  Sanctions Against Adenekan

Last, the Adesanyas argue that the bankruptcy court erred when it found nondischargeable the portion of the Judgment attributable to sanctions against Adenekan.  (Doc. No. 12 at 16.)  The Adesanyas argue that the bankruptcy court erroneously accepted the New Jersey Court's finding that Adenekan "acted deliberately" when he withheld "subpoenaed documents from Novartis as demonstrated by his blatant attempt at hiding and concealing documents about [Global Drug] by falsely certifying he had none, when in fact, he had thousands located in his home."  (*See id.* at 45.)  The Adesanyas assert that the bankruptcy court should not have accepted this finding because the New Jersey District Court accepted the assertions of Novartis's attorneys and "did not perform an independent action to verify" that he was withholding "thousands" of documents.  (*Id.*)  They also argue that the bankruptcy court should have reviewed the New Jersey docket to see that "there were ongoing District court hearings and disputes on the subpoena."  (*Id.*)

This is not the proper forum for the Adesanyas to argue about whether Adenekan "willfully obstruct[ed] Novartis" during discovery in the New Jersey Action or about the nature and extent of that obstruction.  To the extent there was a proper time to raise these arguments, it was in the New Jersey Action, and that time has long since passed.  As the Adesanyas have been warned time and time again, they cannot relitigate issues that the New Jersey District Court decided in reaching a final judgment against them.  Thus, the bankruptcy court was bound by the earlier court's finding that Adesanya willfully withheld thousands of documents during discovery when he refused to comply with discovery subpoenas and multiple court orders.  Contrary to the Adesanyas' contentions, the parties litigated Adenekan's discovery violations below in numerous court hearings and eventually, through formal motions papers, and those violations were the basis for the court's sanctions award against Adenekan, which was part of the final Judgment.  *See Haize v. Hanover Ins. Co.*, 536 F.2d 576, 579 (3d Cir. 1976) (explaining that collateral estoppel bars relitigation of an issue that was:  (1) involved in a prior action, (2) actually litigated, and (3) determined by a valid and final judgment, which was (4) essential to the prior judgment); *Lieber v. Marcus*, Civil Action No. 12–6549 (JLL), 2012 WL 6725839, at *4 n.7 (D.N.J. Dec. 27, 2012) ("Here, Plaintiffs are precluded from arguing that the legal services rendered by the Defendant in the Underlying Litigation did not conform to the applicable standard of care because this issue was litigated before Judge Steele, whose decision is a valid final judgment on the merits.  The determination of the issue of whether Defendants had committed legal malpractice in connection with the Underlying Litigation was clearly essential to the judgment (awarding Defendants legal fees associated with their work in the Underlying Litigation)." (citations omitted)).

The Court finds no error in the bankruptcy court's ruling on Count VI.[20]

### D.  September 15, 2021 Order Denying Stay

After the bankruptcy court issued its July 14, 2021 opinion, the Adesanyas appealed the court's ruling and filed a motion to stay and continue in bankruptcy court.  The Adesanyas argue that the bankruptcy court erred when it denied the motion to stay, which was uncontested, and when it failed to address the Adesanyas request to "continue the case."  (*See* Doc. No. 12 at 16–17, 47–48.)

A bankruptcy court *may*, but is not required to, grant a motion simply because it is uncontested.  *See* Local Bankr. R. 9014-3(j) ("If an answer or objection is required to be filed and no timely answer or objection is filed, the movant may file a certification of no opposition with the court and, unless a hearing is required under the F.R.B.P., may request that the court grant the relief requested in the motion without a hearing.").[21]  Here, the bankruptcy court considered the merits of the Adesanyas' motion, applied the correct standard, and found a stay was inappropriate because the Adesanyas failed to show that they were likely to succeed in overturning the bankruptcy court's ruling on appeal.  *See In re Revel AC, Inc.*, 802 F.3d 558, 567–68 (3d Cir. 2015) ("Under Federal Rule of Bankruptcy Procedure 8007, a party can move to stay the effect of a bankruptcy court order pending a resolution on appeal. . . .  [T]he following

---

[20] In connection with this count, the Adesenyas also argue that the district court wrongly held ex parte phone conversations with Novartis's attorneys.  (Doc. No. 12 at 46.)  It is unclear how this argument relates to the New Jersey District Court's sanction award, and in any event, we note that the Adesanyas raised the issue of ex parte communications in their appeal to the Third Circuit and lost on that issue.  *Adesanya*, 755 F. App'x at 158.  It is not for this Court to question the rulings of the appellate court.

[21] Even if Local Bankruptcy Rule 9014-3 explicitly called for the grant of any motion that lacks a timely opposition, the bankruptcy court would still have had some discretion to depart from that rule.  *See United States v. Eleven Vehicles, Their Equipment & Accessories*, 200 F.3d 203, 214–15 (3d Cir. 2000) ("We therefore hold that a district court can depart from the strictures of its own local procedural rules where (1) it has a sound rationale for doing so, and (2) so doing does not unfairly prejudice a party who has relied on the local rule to his detriment.").

factors come into play:  (1) whether the stay applicant has made a strong showing that it is likely

to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay;

(3) whether issuance of the stay will substantially injure the other parties interested in the

proceeding; and (4) where the public interest lies.").  Because the Adesanyas failed to show that

a stay was justified, the bankruptcy court acted within its discretion when it declined to grant a

stay despite the lack of any formal opposition.

The Adesanyas also argue that the court erred when it failed to rule on their request for a

continuance.  We expect the bankruptcy court was at as much of a loss as this Court is to

understand what the Adesanyas were seeking with this request.  They did not explain below, nor

do they explain on appeal, what they mean by a continuance of proceedings.  The bankruptcy

court had issued a final opinion on dischargeability—there were no proceedings to "continue," so

the bankruptcy court did not err in denying the motion to continue.

### E.      Rule 60(d) Request to Vacate Judgment

Finally, the Adesanyas ask this Court to address an issue unrelated to the bankruptcy

court's findings.  They argue that we should vacate the New Jersey Judgment because Novartis's

attorney committed "brazen acts of fraud and fabrication of evidence on both the New Jersey

court and the Bankruptcy court," such that the Judgment should be set aside under Federal Rule

of Civil Procedure 60(d)(3).  (Doc. No. 12 at 51.)

Federal Rule of Civil Procedure 60 governs a district court's power to set aside a prior

judgment, and Rule 60(d)(3) states that no other part of Rule 60 is meant to "limit a court's

power to . . . set aside a judgment for fraud on the court."  Fed. R. Civ. P. 60(d)(3); *see also*

*Hatchigian v. Int'l Broth. of Elec. Workers Local 98 Health & Welfare Fund*, 610 F. App'x 142,

143 (3d Cir. 2015) ("Under Rule 60(d)(3), a district court can 'set aside a judgment for fraud on

the court.'"); *Hobbs v. Pennell*, Civ. No. 87-285-GMS, 2009 WL 1975452, at *3 (D. Del. July 8,

2009) ("It is well established that a court has the inherent power to grant relief from a judgment which is secured by a fraud on the court.").  "The party seeking relief under Rule 60(d)(3) must establish fraud by clear and convincing evidence which involved an unconscionable plan or scheme designed primarily to improperly influence the court in its decision." *In re Marinari*, 596 B.R. 809, 824 n.23 (E.D. Pa. 2019).  "The concept of fraud on the court includes only that species of fraud which does or attempts to, subvert the integrity of the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication, and relief should be denied absent such conduct." *Id.* (quotation marks omitted).

The Adesanyas begin by referencing the bankruptcy court's refusal to accept Novartis's post-trial supplemental exhibits because they were authenticated by Novartis's counsel, not a Novartis employee with personal knowledge.  *See* Fed. R. Evid. 901(a) ("To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."); Fed. R. Evid. 901(b) (listing examples of "evidence that satisfies the requirement," including "*Testimony of a Witness with Knowledge*.  Testimony that an item is what it is claimed to be").  They then assert that the New Jersey District Court's summary judgment opinion relied on many documents that were similarly incorrectly authenticated.  (Doc. No. 12 at 43–44.)  Based on these observations, the Adesanyas reason that "if the Bankruptcy court would not accept the authentication by Appellee attorney based on FRE 901 and FRCP 56(c)," they "seriously question[ ] the legality of the summary judgment opinion and award of the New Jersey district court," which was "based entirely on the inadmissible certifications of the Attorney."  (*Id.* at 44.)

At base, the Adesanyas' argue that Novartis's attorneys failed to properly authenticate exhibits submitted in the New Jersey Action.  Even accepting this argument as true, it does not demonstrate that Novartis or its counsel committed fraud on the court.[22]  *See Herring v. United States*, 424 F.3d 384, 390 (3d Cir. 2005) ("[W]e will employ a demanding standard for independent actions alleging fraud upon the court requiring:  (1) an intentional fraud; (2) by an officer of the court; (3) which is directed at the court itself; and (4) that in fact deceives the court."); *see also Wei v. Pennsylvania*, No. 21-2059, 2021 WL 4544139, at *1 (3d Cir. Oct. 5, 2021) ("Wei disputes the defendants' account of the evidence and argues that his interpretation of certain evidence should be credited over the defendants' testimony and interpretation of other evidence.  Claims of false statements by lawyers or parties are a serious matter and might meet some definitions of fraud, but the phrase 'fraud on the court' has a special, well-understood and limited office.  Inaccurate assertions in lawsuits are commonplace, and do not generally rise to the level of fraud on the court." (citations and quotation marks omitted)); *Gagliardi v. Courter*, Civil Action No. 02-2035, 2011 WL 710221, at *2 (W.D. Pa. Feb. 22, 2011) ("This is a 'demanding standard,' reserved for 'egregious misconduct,' perpetrated by an 'officer of the court.'  The types of misconduct which constitute fraud on the court include bribery of jurors or a judge, or fabrication of evidence by attorneys, but do not include perjury by a witness." (quoting *Herring*, 424 F.3d at 390)).

The Adesanyas also argue that Novartis's attorneys committed fraud on the New Jersey District Court when they engaged in ex parte communications with that court.  (Doc. No. 12 at

---

[22] As an aside, the Court reminds the Adesanyas that any concern about the authenticity of the evidence presented in the New Jersey Action should have been raised in that action.  Indeed, failure to do so amounts to waiver of the issue.  *See United States v. Limehouse*, 386 F. App'x 109, 112 (3d Cir. 2010) ("It appears that Limehouse challenges the authenticity of this document for the first time on appeal; however, as such, that challenge is waived.").  The applicability of the waiver doctrine further suggests that the submission of incorrectly authenticated evidence is not fraud on the court.

48.)  Without knowing the subject of those conversations or their ultimate effect, we cannot find that the mere fact of ex-parte conversations amounts to fraud on the court.  Moreover, and as discussed *supra* n.14, the Adesanyas raised this issue with the Third Circuit and lost.  Again, it is not for this Court to question a ruling of the appellate court.

Last, the Adesanyas argue that Novartis's attorneys in the bankruptcy action wrongly concealed their status as debt collectors, submitted a "perjurious Exhibit 83 at [t]rial," and submitted "illegal" post-trial supplemental exhibits.  (Doc. No. 12 at 49.)  We do not need to consider the substance of these actions—all of which occurred during the bankruptcy case and *after* the New Jersey Action—as they are irrelevant to whether Novartis committed fraud on the *New Jersey District Court* during the *New Jersey Action*.

## IV.    CONCLUSION

The Court rejects the Adesanyas' arguments on appeal in their entirety.  The rulings of the bankruptcy court, including the July 14, 2021 Opinion and Order finding the majority of the Judgment nondischargeable, are affirmed.  An appropriate order follows.